**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| DEBORAH LEPPERT and ZACHARY | : | |
| CHERNIK, individually and on behalf | : | |
| of a class of similarly situated | : | Case No.: |
| individuals, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | **DEMAND FOR JURY TRIAL** |
| v. | : | |
| | : | |
| CHAMPION PETFOODS USA, INC. | : | |
| and CHAMPION PETFOODS LP, | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

**CLASS ACTION COMPLAINT**

1.      Plaintiffs Deborah Leppert and Zachary Chernik ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint against Defendants Champion Petfoods USA, Inc. and Champion Petfoods LP ("Defendants"), for their negligent, reckless, and/or intentional practice of misrepresenting and failing to fully disclose the presence of heavy metals and toxins in their pet food sold throughout the United States.  Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Classes (defined below), including requiring full disclosure of all such substances in Defendants' marketing, advertising, and labeling and restoring monies to the members of the proposed Classes. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**DEFENDANTS MARKET THEMSELVES AS ONLY SELLING**
**PREMIUM CAT FOOD WITH THE SIMPLE MISSION OF**
**"TO BE TRUSTED BY PET LOVERS"**

2.      Defendants manufacture, market, advertise, label, distribute, and sell pet food under the brand names Acana and Orijen throughout the United States, including in this District.

3.      Defendants have created a niche in the pet food market by "making biologically 'appropriate' pet food- as close to what animals would eat in nature as possible- and producing it using fresh, natural ingredients…" They then charge a premium for this purportedly higher-quality food.  The founder of the company, Peter Muhlenfeld, said, "Our core family beliefs are [] entrenched in the company, and that is to make the very best food."[1]

4.      Defendants tout that "Biologically Appropriate™ ORIJEN represents a new class of food, designed to nourish dogs and cats according to their evolutionary adaptation to a diet rich and diverse in fresh meat and protein[]" and that it is "trusted by pet lovers everywhere."[2]

5.      Defendants' packaging and labels further emphasize fresh, quality, and properly sourced ingredients and even declares their cat food has "ingredients we love from people we know and trust":

---

[1] The Globe and Mail, "How once-tiny pet-food maker took a bite of the global market," Jan. 16, 2018,https://www.theglobeandmail.com/report-on-business/small-business/canadian-powerhouse-export-your-dog-is-eating-it/article37605774/ (last accessed Feb. 6, 2018).

[2] https://www.orijen.ca/us/ (last accessed June 21, 2018).

2



6.     Yet nowhere in the labeling, advertising, statements, warranties, and/or packaging do Defendants disclose that the Contaminated Pet Foods (defined herein) contain levels of arsenic, mercury, lead, cadmium, and/or bisphenol A ("BPA") — all known to pose health risks to humans and animals, including cats:[3]

| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|---|
| ACANA Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food | 385.00 | 141.50 | 32.60 | 9.40 | 418.10 |
| ACANA Regionals Grasslands with Lamb, Trout, and Game Bird Dry Cat Food | 405.80 | 139.00 | 39.50 | 14.30 | 407.60 |

---

[3] All the below pet food collectively is referred to as the "Contaminated Cat Foods." Discovery in this action likely will lead to the identification of additional products based on Defendants' public acknowledgment that their foods do contain heavy metals.

| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|---|
| ACANA Regionals Meadowland with Poultry, Freshwater Fish and Eggs Dry Cat Food | 959.20 | 233.80 | 39.30 | 13.40 | 310.40 |
| ACANA Regionals Pacifica with Herring, Pilchard, Flounder, Hake & Rockfish Dry Cat Food | 2504.50 | 173.60 | 79.30 | 48.80 | 34.00 |
| ACANA Regionals Wild Atlantic New England Fish and Fresh Greens Dry Cat Food | 3639.40 | 134.60 | 105.30 | 45.50 | 245.40 |
| ORIJEN Cat and Kitten Dry Cat Food | 821.20 | 140.60 | 103.10 | 13.30 | 194.10 |
| ORIJEN Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food | 1086.10 | 224.00 | 68.10 | 20.80 | 342.50 |
| ORIJEN Six Fish New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Cat Food | 3187.50 | 135.20 | 154.80 | 54.10 | 42.00 |

7.      Defendants warrant, promise, represent, label, and/or advertise that the Contaminated Cat Foods are free of any heavy metals and/or chemicals like BPA by assuring the food represents an evolutionary diet that mirrors that of a wildcat – free of anything "nature didn't intend your cat to eat:"



8.      Defendants assert that: "ACANA foods incorporate meats, organs and cartilage in WholePrey ratios that mirror Mother Nature, delivering nutrients naturally.  So you won't find long lists of synthetic supplements."[4]   Defendants similarly claim "ORIJEN mirrors the evolutionary diet with WholePrey ratios that deliver nutrients naturally, reducing the need to add a long list of synthetic vitamins, minerals and amino acids, so only choline, zinc and copper are added."[5]

9.      Defendants further warrant, promise, represent, advertise and declare that the Contaminated Cat Foods are made with protein sources that are deemed "fit for human consumption:"

---

[4]http://acana.com/wp-content/uploads/2015/10/DS-ACANA-Cat-Brochure-0518.pdf (last accessed June 13, 2018).

[5] https://www.orijen.ca/wp-content/uploads/2014/02/NS-ORI_Cat_BROCHURE-002-lo.pdf (last accessed June 13, 2018).



**THE INCLUSION OF HEAVY METALS, BPA, AND ANY OTHER
CHEMICALS AT ANY LEVEL WOULD BE MATERIAL TO A
REASONABLE CONSUMER BASED ON THE INHERENT AND
KNOWN RISKS OF CONSUMPTION AND/OR EXPOSURE**

***Heavy Metals***

10.     Based on the risks associated with exposure to higher levels of arsenic, both the

U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug Administration ("FDA")

have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human

consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA).[6]

---

[6] The FDA has taken action based on consumer products exceeding this limit, including testing
and sending warning letters to the manufacturers. *See*, *e.g.*, Warning Letter from FDA to Valley
Processing, Inc. (June 2, 2016), https://www.fda.gov/iceci/enforcementactions/warningletters
/2016/ucm506526.htm (last accessed June 21, 2018).

Moreover, the FDA is considering limiting the action level for arsenic in rice cereals for infants to 100 ppb.[7]

11.     Arsenic is deadly to cats in doses of just one to twelve milligrams per pound of body weight.[8]  Drinking water with levels greater than 0.25ppm is considered potentially toxic, especially to large animals.[9]

12.     The Contaminated Cat Foods contain arsenic, which can affect the gastrointestinal and cardiovascular systems, as well as lead to circulatory collapse.[10]  Arsenic poisoning can be caused by acute and/or repeated exposure to the toxin over a long period of time.

13.     The Contaminated Cat Foods also contain lead, which is another carcinogen and developmental toxin known to cause health problems.  Exposure to lead in food builds up over time.  Buildup can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, and affect normal cell metabolism as well as cause serious injuries to the central nervous and gastrointestinal systems.

14.     Additionally, the Contaminated Cat Foods contain mercury, which can cause damage to the kidneys and to the cardiovascular, nervous, and neurological systems in cats. Exposure to mercury can also interfere with metabolic activity, leading to tissue necrosis and degeneration. Continued exposure to mercury can also injure the inner surfaces of the digestive tract and abdominal cavity.

---

[7] FDA, Draft Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level (Apr. 2016), https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocuments RegulatoryInformation/UCM493152.pdf (last accessed June 21, 2018).

[8] http://www.petwellbeingwiki.com/wiki/cat_arsenic_poisoning/ (last accessed June 11, 2018).

[9] https://www.merckvetmanual.com/toxicology/arsenic-poisoning/inorganic-arsenicals-toxicity (last accessed June 11, 2018).

[10] https://healthypets.mercola.com/sites/healthypets/archive/2015/01/11/arsenic-poisoning.aspx (last accessed June 11, 2018).

15.     Finally, the Contaminated Cat Foods contain cadmium, which is "extremely toxic and has toxic biological effects at concentrations smaller than almost any commonly found mineral."[11]  Exposure to cadmium has been observed to cause anemia, liver disease, and nerve or brain damage in animals eating or drinking it.  The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[12]

16.     Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[13]

17.     Despite the known risks of exposure to heavy metals, Defendants have negligently, wrongfully, misleadingly, and knowingly advertised and sold the Contaminated Cat Foods without disclosing or providing any label or warning indicating to consumers, like Plaintiff, that the products contain heavy metals or that these toxins can over time accumulate in the cat's body to the point where poisoning, injury, and/or disease can occur.

18.     Additionally, Defendants knew or should have been aware that a consumer would feed the Contaminated Cat Foods multiple times each day to his or her cat, making it the main, if not only, source of food.  This leads to repeated exposure of the heavy metals to the cat.

19.     Defendants' omissions are material, false, misleading, and reasonably likely to deceive the public.  This is true especially in light of the long-standing campaign by Defendants

---

[11] http://tedeboy.tripod.com/drfoxvet/id150.html (last accessed June 11, 2018).

[12] https://www.atsdr.cdc.gov/phs/phs.asp?id=46&tid=15b (last accessed June 21, 2018).

[13] https://www.fda.gov/Food/FoodborneIllnessContaminants/Metals/default.htm (last accessed June 11, 2018).

to market the Contaminated Cat Foods as healthy and safe in order to induce consumers, such as Plaintiff, to purchase the products.  For instance, Defendants market the Contaminated Cat Foods as "Biologically Appropriate," using "Fresh Regional Ingredients" that are "guaranteed to keep your cat or kitten healthy, happy, and strong."

20.     Moreover, Defendants devote significant web and packaging space to the marketing of their DogStar® Kitchens, which they tell consumers "are the most advanced pet food kitchens on earth, with standards that rival the human food processing industry."  They also claim that the kitchens "meet the strictest standards with ingredient suppliers approved by the US Department of Agriculture (USDA) and the US Food and Drug Administration (FDA)."

21.     Defendants state on their website that Orijen "features unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive."

22.     Using such descriptions and promises make Defendants' advertising campaign deceptive based on the presence of heavy metals in the Contaminated Cat Foods. Reasonable consumers, like Plaintiffs, would consider the mere inclusion of heavy metals in the Contaminated Cat Foods as a material fact when considering what pet food to purchase.  Defendants' above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Cat Foods are healthy, safe, and free of contaminants such as arsenic and lead.  Moreover, Defendants knew or should have reasonably expected that the presence of heavy metals in its Contaminated Cat Foods is something an average consumer would consider when purchasing cat food.

23.     Moreover, a reasonable consumer, such as Plaintiffs and other members of the Classes (as defined herein), would have no reason to not believe and/or anticipate that the

Contaminated Cat Foods are "Biologically Appropriate" foods that use "Fresh Regional Ingredients" that are guaranteed to "keep your cat or kitten healthy, happy and strong."

24.     Non-disclosure and/or concealment of the heavy metals in the Contaminated Cat Foods coupled with the misrepresentations alleged herein by Defendants that suggest the food is safe and provides "everything your dog or cat needs to thrive" is intended to and does, in fact, cause consumers to purchase a product that Plaintiffs and members of the Classes would not have bought if the Defendants had disclosed the presence of heavy metals. As a result of these false or misleading statements and omissions, Defendants have generated substantial sales of the Contaminated Cat Foods.

25.     The expectations of reasonable consumers and the deception of these consumers by Defendants' advertising, misrepresentations, packaging, labeling is further highlighted by the public reaction to this lawsuit as reported by various websites.

26.     Plaintiffs bring this action individually and on behalf of all other similarly situated consumers within Ohio and Illinois who purchased the Contaminated Cat Foods, in order to cause the disclosure of the presence of heavy metals that pose a known risk to both humans and animals in the Contaminated Cat Foods, to correct the false and misleading perception Defendants have created in the minds of consumers that the Contaminated Cat Foods are high quality, safe, and healthy and to obtain redress for those who have purchased the Contaminated Cat Foods.

### *Bisphenol A ("BPA")*

27.     The dangers of BPA in human food are recognized by the FDA, as well as by the state of Illinois. For instance, manufacturers and wholesalers are prohibited from selling any children's products that contain BPA and any infant formula, baby food, or toddler food stored in containers with intentionally-added BPA

28.     Still, certain Contaminated Cat Foods are sold by Defendants that contain levels of BPA, an industrial chemical that is an endocrine disruptor.  BPA has been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems.[14]

29.     Despite the presence of this harmful chemical, Defendants prominently warrant, claim, feature, represent, advertise, or otherwise market the Contaminated Cat Foods as made from "Biologically Appropriate" and "Fresh Regional Ingredients" that are guaranteed to "keep your cat or kitten healthy, happy, and strong."

30.     Defendants' website and packaging also warrants, claims, features, represents, advertises, or otherwise markets that its products are natural. In fact, Orijen's slogan is "Nourish as Nature Intended."



31.     In promoting their promise, warranty, claim, representation, advertisement, or otherwise marketing that the Contaminated Cat Foods are safe and pure, Defendants further

---

[14] Christian Nordquist, *Bisphenol A: How Does It Affect Our Health?* Medical News Today (May 24, 2017), https://www.medicalnewstoday.com/articles/221205.php (last accessed June 21, 2018).

promote the capabilities and advanced caliber of their kitchens and ingredient freshness to their customers:

> Equipped with state-of-the-art fresh food processing technologies, our DogStar® kitchens feature 25,000 square feet of cooler space, capable of holding over 500,000 pounds of fresh local meats, fish and poultry, plus fresh whole local fruits and vegetables.

> Unmatched by any pet food maker, our ingredients arrive at our kitchens fresh, bursting with goodness, and typically within 48 hours from when they were harvested.

32.     Defendants' websites further warrants, claims, features, represents, advertises, or otherwise markets that the Contaminated Cat Foods are manufactured in such a way that would prevent BPA from forming by closely monitoring temperatures and quality:

> "[O]ur unique Votator Heat Exchangers bring chilled fresh ingredients to room temperature without introducing water or steam, which enables us to add even more fresh meats into our foods."

> "Referred to as 'the most significant preconditioning development for extrusion cooking in the last 20 years,' our High Intensity Preconditioners were custom-built for DogStar®, feeding fresh meats from the Votators to Extruders at rates previously unheard of, and without high temperatures."

> "At the heart of our kitchens is a twin thermal extruder which is fed fresh ingredients from our High Intensity Preconditioner. The first of its kind in North America, it took 11 months to build, and features custom steam injection to enable very high fresh meat inclusions and a gentle cooking process which helps further reduce the carbohydrates in our foods and preserves their natural goodness."

33.     Additionally, Defendants include representations related to the manufacturing on the labels and marketing that their dried meats are "gently dehydrated [at a] low temp."[15]

34.     Defendants engaged in deceptive advertising and labeling practice by expressly warranting, claiming, stating, featuring, representing, advertising, or otherwise marketing on Acana and Orijen labels and related websites that the Contaminated Cat Foods are natural, fit for

---

[15]     https://www.orijen.ca/wp-content/uploads/2014/02/NS-ORI_Cat_BROCHURE-002-lo.pdf (last accessed June 13, 2018).

human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" that are guaranteed to "keep your cat or kitten healthy, happy, and strong."

35.     Based on these false representations, Defendants charge a premium, knowing that the claimed natural make-up of the Contaminated Cat Foods (as well as all of the other alleged false and/or misleading representations discussed herein) is something an average consumer would consider as a reason when choosing to purchase a more expensive cat food.  By negligently and/or deceptively representing, marketing, and advertising the Contaminated Cat Foods as natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients," Defendants wrongfully capitalized on, and reaped enormous profits from, consumers' strong preference for natural pet food products.

36.     Plaintiffs bring this action individually and on behalf of all other similarly situated consumers within Ohio and Illinois who purchased the Contaminated Cat Foods, in order to cause the disclosure of the presence of BPA that pose a known risk to both humans and animals in the Contaminated Cat Foods, to correct the false and misleading perception Defendants have created in the minds of consumers that the Contaminated Cat Foods are high quality, safe, and healthy, and to obtain redress for those who have purchased the Contaminated Cat Foods.

## JURISDICTION AND VENUE

37.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Classes reside in states other than the states in which Defendants are citizens and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d) do not apply.

38.     Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiff Chernik resides in and suffered injury as a result of Defendants' acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendants conduct substantial business in this district, Defendants have intentionally availed themselves of the laws and markets of this district, and Defendants are subject to personal jurisdiction in this district.

## PARTIES

39.     Plaintiff Leppert is, and at all times relevant hereto has been, a citizen of the state of Ohio.  Plaintiff Leppert purchased the following Contaminated Cat Foods for her two Maine Coon cats, Abagail and Taikun: Orijen Cat and Kitten Dry Cat Food, Orijen Six Fish Dry Cat Food, and Orijen Fit & Trim Dry Cat Food. Plaintiff Leppert purchased the Contaminated Cat Foods monthly between approximately November 2011 and February 2018.  Plaintiff Leppert generally bought the cat food at Pet People in Powell, Ohio.  Since consuming the Contaminated Cat Foods, Abagail has suffered from gastrointestinal issues that required surgery and Taikun has been diagnosed with chronic kidney disease.  Prior to purchasing the Contaminated Cat Foods, Plaintiff Leppert saw the nutritional claims on the packaging, which she relied on when deciding whether to purchase the Contaminated Cat Foods.  During that time, based on the false and misleading claims, warranties, representations, advertisements and other marketing by Defendants, Plaintiff Leppert was unaware that the Contaminated Cat Foods contained any level of heavy metals, chemicals, or toxins and would not have purchased the food if that had been fully disclosed.

40.     As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff Leppert was injured when she paid a purchase price or a price premium for the Contaminated Cat Foods that did not deliver what was promised.  She paid the

premium price on the assumption that the labeling and marketing of the Contaminated Cat Foods were accurate and that they were healthy, superior quality, natural, and safe for cats to ingest. Plaintiff Leppert would not have paid this money had she known that the Contaminated Cat Foods contained any levels of the heavy metals, chemicals, and/or toxins. Plaintiff Leppert was further injured when she paid a premium for the Contaminated Cat Foods that have no or *de minimis* value based on the presence of the alleged heavy metals, chemicals, and toxins. Damages can be calculated through expert testimony at trial. Further, Plaintiff Leppert would purchase pet foods that are truly natural and biologically appropriate and do not contain heavy metals and/or BPA in the future and she would pay a premium for those products. However, should Plaintiff Leppert encounter the Contaminated Cat Foods in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Cat Foods.

41.     Plaintiff Zachary Chernik ("Plaintiff Chernik") is, and at all times relevant hereto has been, a citizen of the state of Illinois. Plaintiff Chernik purchased the following Contaminated Cat Foods for his cats, Addicus, a Persian who died in June 2008, and Ashes, a 9-year-old domestic shorthair: Orijen Six Fish Dry Cat Food, Orijen Regional Red, Acana Pacifica, and Acana Wild Prairie. Plaintiff Chernik purchased a 15-pound bag of the Contaminated Cat Foods approximately every 10-12 weeks beginning in 2006 until approximately October 2016. Plaintiff Chernik generally bought the cat food at his local Pet Food Experts, Zeus and Company Pet Supplies, and Woodstock Feed and Seed. Prior to purchasing the Contaminated Cat Foods, Plaintiff Chernik saw the nutritional claims on the packaging, which he relied on when deciding whether to purchase the Contaminated Cat Foods. During that time, based on the false and misleading claims, warranties, representations, advertisements and other marketing by Defendants, Plaintiff Chernik

was unaware that the Contaminated Cat Foods contained any level of heavy metals, chemicals, or toxins and would not have purchased the food if that had been fully disclosed.

42.     As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff Chernik was injured when he paid a purchase price or a price premium for the Contaminated Cat Foods that did not deliver what was promised.  He paid the premium price on the assumption that the labeling and marketing of the Contaminated Cat Foods were accurate and that they were healthy, superior quality, natural, and safe for cats to ingest. Plaintiff Chernik would not have paid this money had he known that the Contaminated Cat Foods contained any levels of the heavy metals, chemicals, and/or toxins. Plaintiff Chernik was further injured when he paid a premium for the Contaminated Cat Foods that have no or *de minimis* value based on the presence of the alleged heavy metals, chemicals, and toxins.  Damages can be calculated through expert testimony at trial.  Further, should Plaintiff Chernik encounter the Contaminated Cat Foods in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Cat Foods.

43.     Defendant Champion Petfoods USA Inc. ("Champion USA") is incorporated in Delaware.  Its headquarters and principal place of business, as of March 2016, is located at 12871 Bowling Green Road, Auburn, KY 42206. Since that time, all Contaminated Pet Foods sold in the United States are manufactured, sourced, and sold by Champion USA.

44.     Defendant Champion Petfoods LP ("Champion Canada") is a Canadian limited partnership with its headquarters and principal place of business located at 11403-186 St NW, Edmonton, Alberta T5S 2W6.  Defendant Champion Canada wholly owns, operates, and/or controls Defendant Champion USA. Prior to March 2016, all Contaminated Pet Foods sold in the United States were manufactured, sourced, and sold by Champion Canada.

45.     Defendants formulate, develop, manufacture, label, distribute, market, advertise, and sell the Contaminated Cat Foods under the cat food brand names Orijen and Acana throughout the United States, including in this District, during the Class Period (defined below).  The advertising, labeling, and packaging for the Contaminated Cat Foods, relied upon by Plaintiffs, was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein.  The marketing, advertising, packaging, and labeling for the Contaminated Cat Foods was designed to encourage consumers to purchase the Contaminated Cat Foods and reasonably mislead the reasonable consumer, *i.e.*, Plaintiffs and members of the Classes, into purchasing the Contaminated Cat Foods.  Defendants own, manufacture, and distribute the Contaminated Cat Foods and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling, and advertising for the Contaminated Cat Foods.

## FACTUAL ALLEGATIONS

**The Contaminated Cat Foods**

46.     The Contaminated Cat Foods include the following:

(a) Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food



(b) Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Cat Food



18

(c) Acana Regionals Meadowland with Poultry, Freshwater Fish, and Eggs Dry
Cat Food



(d) Acana Regionals Pacifica with Herring, Pilchard, Flounder, Hake, and
Rockfish Dry Cat Food



(e) Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry
Cat Food



(f) Orijen Cat and Kitten Dry Cat Food



(g) Orijen Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food



(h) Orijen Six Fish New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Cat Food



(i) Orijen Tundra Boer Goat, Wild Boar, Venison, Arctic Char, Free-Run Duck, and Mutton



(j) Orijen Fit and Trim Fresh Free-run Chicken and Turkey, Nest-Laid Eggs, and Wild-Caught Fish



**Heavy Metals Create Known Risks When Ingested**

47.     Toxins like arsenic, mercury, cadmium and lead can cause serious illness to humans and animals.  A company should be vigilant to take all reasonable steps to prevent family pets from ingesting these toxins.

48.     Arsenic is a semi-metal element in the periodic table.  It is odorless and tasteless and does not degrade or disappear.  Arsenic occurs naturally in the environment as an element of the earth's crust; it is found in rocks, soil, water, air, plants, and animals.  Arsenic is combined with other elements such as oxygen, chlorine, and sulfur to form inorganic arsenic compounds. Historically, arsenic compounds were used in many industries, including: (i) as a preservative in pressure-treated lumber; (ii) as a preservative in animal hides; (iii) as an additive to lead and copper for hardening; (iv) in glass manufacturing; (v) in pesticides; (vi) in animal agriculture; and (vii) as arsine gas to enhance junctions in semiconductors.  The United States government has canceled the approvals of some of these uses, such as arsenic-based pesticides, for health and safety reasons. Some of these cancellations were based on voluntary withdrawals by producers.  For example, manufacturers of arsenic-based wood preservatives voluntarily withdrew their products in 2003 due to safety concerns, and the EPA signed the cancellation order.  In the Notice of Cancellation Order, the EPA stated that it "believes that reducing the potential residential exposure to a known human carcinogen is desirable."

49.     Inorganic arsenic is a known cause of human cancer.  The association between inorganic arsenic and cancer is well documented.  As early as 1879, high rates of lung cancer in miners from the Kingdom of Saxony were attributed, in part, to inhaled arsenic.  By 1992, the combination of evidence from Taiwan and elsewhere was sufficient to conclude that ingested inorganic arsenic, such as that found in contaminated drinking water and food, was likely to

increase the incidence of several internal cancers.[16]  The scientific link to skin and lung cancers is particularly strong and longstanding, and evidence supports conclusions that arsenic may cause liver, bladder, kidney, and colon cancers as well.

50.     Lead is a metallic substance formerly used as a pesticide in fruit orchards, but the use of such pesticides is now prohibited in the United States.  Lead can build up in the body over time, resulting in a cumulative exposure that can over time become toxic and seriously injurious to health.  Lead poisoning can occur from ingestion of food or water containing lead.  Acute or chronic exposure to material amounts of lead can lead to severe brain and kidney damage, among other issues, and ultimately cause death.

51.     In recognition of the dangers of lead, the State of Illinois has enacted the Illinois Lead Poisoning Prevention Act.  Under 77 Ill. Adm. Code 845.20, an elevated level of lead occurs when the level of lead in the blood is "ten micrograms/deciliter or higher."

52.     The FDA has set standards that regulate the maximum parts per billion of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic.  *See* 21 C.F.R. §165.110(b)(4)(iii)(A).

53.     Mercury is a known toxin that creates health risks to both humans and animals. The impact of the various ways humans and animals are exposed and ingest mercury has been studied for years.  As early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals.[17]

---

[16] For example, because the groundwater in Taiwan is contaminated with arsenic, extensive long-term studies have been conducted on the effects of chronic exposure to arsenic.  Other countries where cancer and other adverse health effects have been linked to chronic arsenic exposure include Bangladesh, India, Chile, and China.

[17] https://www3.epa.gov/airtoxics/112nmerc/volume5.pdf (last accessed June 21, 2018).

54. Based on the toxicity and risks of mercury, regulations have been enacted at both the federal and state levels.

55. Cadmium is likewise a known toxin that creates risk when ingested by animals or humans. It has been specifically noted that "Kidney and bone effects have [] been observed in laboratory animals ingesting cadmium. Anemia, liver disease, and nerve or brain damage have been observed in animals eating or drinking cadmium."[18]

**Defendants Falsely Advertise the Contaminated Cat Foods as Nutritious, Superior Quality, and Healthy While Omitting Any Mention of the Heavy Metals, as Well as Claim the Foods Are Natural, Pure, and Mirror a Cat's Evolutionary Diet despite the Inclusion of the Industrial Chemical BPA**

56. Defendants formulate, develop, manufacture, label, package, distribute, market, advertise, and sell their extensive Acana and Orijen lines of dry and freeze-dried pet food products across the United States, including the Contaminated Cat Foods.

57. In 2016, Defendants opened DogStar Kitchens, a 371,100 square foot production facility on 85 acres of land outside Bowling Green, Kentucky. The facility can produce up to 220 million pounds of Acana and Orijen food per year. Since production began, all Acana and Orijen foods sold in the United States are manufactured at the DogStar Kitchens facility. Prior to the construction of the DogStar Kitchens, Defendants' Acana and Orijen products were exclusively manufactured in Canada.

58. Champion Petfoods' President and Chief Executive Officer, Frank Burdzy, stated, "The US is our fastest growing market."[19]

59. Defendants have represented that their DogStar Kitchens meet the European Union's standard for pet food ingredients processing, as well as those standards in Canada and the

---

[18] https://www.atsdr.cdc.gov/ToxProfiles/tp5-c1-b.pdf (last accessed June 21, 2018).
[19] https://www.foodengineeringmag.com/articles/95994-champion-petfoods-opens-dogstar-kitchens (last accessed June 13, 2018).

United States. They have also represented a commitment to using fresh and local ingredients, including wild-caught fish.

60.     Defendants warrant, claim, state, represent, advertise, label, and market their Contaminated Cat Foods as natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" that are guaranteed "to keep your cat or kitten healthy, happy, and strong."  Defendants had a duty to ensure that these statements were true.  As such, Defendants knew or should have known that the Contaminated Cat Foods included the presence of heavy metals and BPA.

61.     Likewise, by warranting, claiming, stating, featuring, representing, advertising or otherwise marketing that Orijen and Acana foods, including the Contaminated Cat Foods, are natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients," Defendants had a duty to ensure that there were no chemicals included in the Contaminated Cat Foods. In fact, Defendants offered further assurances by representing that they never outsource and claim, "[W]e prepare ORIJEN in our own kitchens where we control every detail, from recipe development and food safety to ingredient sourcing and food production."

62.     Defendants specifically promise on their website, "[W]e make ORIJEN in our own award-winning kitchens with fresh ingredients raised by farmers and fishers we know and trust." Additionally, Defendants "are dedicated to the highest standards of authenticity, nutritional integrity, and food safety."  According to the Orijen and Acana websites, Defendants' kitchen "feature[s] state-of-the-art fresh food processing technologies."  As such, Defendants knew or should have known that higher temperatures coupled with the type of containers used in manufacturing create a real risk of BPA in their products.

63.     The Contaminated Cat Foods are available at numerous retail and online outlets in the United States, including Ohio and Illinois.

64.     The Contaminated Cat Foods are widely advertised and Defendants employ a Chief Marketing Officer, a Vice President for Customer Engagement, and a Director of Marketing in both the United States and Canada.

65.     The official websites for Acana and Orijen display the Contaminated Cat Foods, including descriptions and full lists of ingredients and the following promises:



**AWARD-WINNING FOODS AND TREATS**

Biologically Appropriate™ ORIJEN represents a new class of food, designed to nourish dogs and cats according to their evolutionary adaptation to a diet rich and diverse in fresh meat and protein.

ORIJEN features unmatched inclusions of fresh free-run poultry, whole nest-laid eggs, whole wild-caught fish and ranch-raised meats – farmed or fished in our region by people we know and trust, and delivered to our kitchens daily so they're brimming with goodness.

Trusted by pet lovers everywhere, award-winning ORIJEN foods and treats are guaranteed to keep your cherished dogs and cats happy, healthy and strong!

**AWARD-WINNING BIOLOGICALLY APPROPRIATE**™

OUR MISSION IS CLEAR AND STRONG

We make Biologically Appropriate™ dog and cat foods from Fresh Regional Ingredients and we make them from start to finish in our very own award-winning kitchens.

Our mission represents a new standard in pet food, designed to nourish your dog and cat in two ways. First, according to its natural evolution to a meat and protein-rich diet. Second, using meats, poultry, eggs and fish that are sustainably ranched, farmed or fished by local suppliers and delivered to our kitchens fresh each day.

We think you'll love ACANA. More importantly, we think your dogs and cats will too.

66.     Defendants' websites repeat the false and misleading claims, warranties, representations, advertisements, and other marketing about the Contaminated Cat Foods' benefits, quality, purity, and natural make-up, without any mention of the heavy metals and/or BPA they

contain.  This is not surprising given that natural pet food sales represent over $5.5 billion in the United States and have consistently risen over the years.[20]



67.    Moreover, Defendants have acknowledged the importance of quality cat food to the reasonable consumer and are well aware of the trust that consumers have placed in them. According to Burdzy, "Our No. 1 mandate is BAFRINO- biologically appropriate, fresh regional ingredients, never outsourced…. We build relationships with our suppliers and farms and fisheries. We are trusted by pet owners." [21]

68.    As a result of Defendants' omissions, a reasonable consumer would have no reason to suspect the presence of heavy metals and/or BPA in the Contaminated Cat Foods without

---

[20] Statista, *Natural and Organic Pet Food Sales in the U.S. from 2009 to 2019,* The Statistics Portal (accessed Oct. 25, 2017). https://www.statista.com/statistics/548957/us-sales-of-natural-and-organic-pet-food/ (last accessed June 21, 2018).

[21] Mason, C., *Champion Petfoods DogStar Kitchens holds housewarming*, BOWLING GREEN DAILY NEWS (Jan. 5, 2016) *available at* http://www.bgdailynews.com/news/champion-petfoods-dogstar-kitchens-holds-housewarming/article_bf34275d-2242-5f3f-a9cc-14174235acc1.html?utm_medium=social&utm_source=email&utm_campaign=user-share   (last accessed June 13, 2018).

conducting his or her own scientific tests or reviewing third party scientific testing of these products.

69. However, after conducting third party scientific testing, it is clear that the Contaminated Cat Foods do in fact contain levels of both heavy metals and BPA.

**Defendants' Statements and Omissions Violate Illinois and Ohio Laws**

70. Illinois and Ohio laws are designed to ensure that a company's claims about its products are truthful and accurate. Defendants violated these state laws by negligently, recklessly, and/or intentionally incorrectly claiming that the Contaminated Cat Foods are pure, healthy, and safe for consumption and by not accurately detailing that the products contain toxic heavy metals and/or BPA. Defendants misrepresented that the Contaminated Cat Foods are natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" that are guaranteed "to keep your cat or kitten healthy, happy, and strong."

71. Defendants' marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiff to plead reliance upon each advertised misrepresentation.

72. Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Cat Foods were healthy, safe for consumption, and free of harmful ingredients such as arsenic and lead. Likewise, Defendants have engaged in this long-term advertising campaign to convince potential customers that the Contaminated Cat Foods are natural, high quality, and safe despite the presence of BPA in the food.

**Plaintiffs' Reliance Was Reasonable and Foreseen by Defendants**

73.     Plaintiffs reasonably relied on Defendants' own claims, warranties, representations, advertisements, and other marketing concerning the particular qualities and benefits of the Contaminated Cat Foods.

74.     Plaintiffs relied upon Defendants' false and/or misleading representations alleged herein, including the websites and the Contaminated Cat Foods' labels and packaging in making her purchasing decisions.

75.     Any reasonable consumer would consider the labeling of a product (as well as the other false and/or misleading representations alleged herein) when deciding whether to purchase the Contaminated Cat Foods.   Here, Plaintiffs relied on the specific statements and misrepresentations by Defendants that the Contaminated Cat Foods were natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" that are guaranteed "to keep your cat or kitten healthy, happy, and strong" without disclosing the presence of heavy metals, such as arsenic or lead, and BPA.

**Defendants' Knowledge and Notice of Their Breaches of Their Express and Implied Warranties**

76.     Defendants had sufficient notice of their breaches of express and implied warranties. Defendants have, and had, exclusive knowledge of the physical and chemical makeup of the Contaminated Cat Foods.

77.     Additionally, Defendants received notice of the contaminants in their dog and cat food, including the Contaminated Cat Foods, through the Clean Label Project, which found high levels of heavy metals in their dog and cat food products. In fact, Defendants responded to the Clean Label Project's findings. Defendants spoke with the Clean Label Project by phone regarding its findings and methodology, which showed that Orijen products contained higher levels of heavy

metals when compared to other pet foods. The Clean Label Project informed Defendants that it compared Orijen's products to its competitors' products and the reason some of their products received a one-star rating was because the "Orijen products came up lacking."[22] Defendants' direct contact with the Clean Label Project demonstrates their knowledge about the Contaminated Cat Foods.

78.     Defendants also issued a White Paper in defense of the Clean Label Project findings that acknowledged their products contain heavy metals.[23]  In that same White Paper, Defendants stated, "[w]e systematically test ORIJEN and ACANA products for heavy metals (arsenic, cadmium, lead and mercury) at two third-party laboratories."

79.     The White Paper discussed the sources of arsenic, cadmium, lead, and mercury and what Defendants contend to be acceptable levels of those heavy metals in pet food.

80.     Defendants did not widely disseminate this White Paper or direct consumers to it. Moreover, Defendants did not change their packaging or labeling to include a disclaimer that the Contaminated Cat Foods contain any levels of the heavy metals or include a copy of the White Paper findings on the packaging or labeling.  Finally, there is no disclosure as to whether the Contaminated Cat Foods tested by Defendants were manufactured in the United States or Canada.

81.     Defendants likewise had knowledge of the potential risk and inclusion of BPA in their Contaminated Cat Foods. Defendants have publicly stated they ask their suppliers if packaging contains BPA, but also admitted that they do not perform any tests to confirm that the

---

[22] Clean Label Project, "Orijen: Why Aren't You Listening to Your Customers?" http://www.cleanlabelproject.org/orijen-customers/ (last accessed June 13, 2018).
[23] http://www.championpetfoods.com/wp-content/themes/champion-petfoods/res/research/Champion-Petfoods-White-Paper-Heavy-Metals.pdf (last accessed June 13, 2018).

Contaminated Cat Foods are BPA free. Moreover, Defendants no longer boast about "exceeding" regulations when asked if the Contaminated Pet Foods are BPA free.

**Privity Exists with Plaintiffs and the Proposed Classes**

82.     Defendants knew that consumers such as Plaintiffs and the proposed Classes would be the end purchasers of the Contaminated Cat Foods and the target of their advertising and statements.

83.     Defendants intended that the warranties, advertising, labeling, statements, and representations would be considered by the end purchasers of the Contaminated Cat Foods, including Plaintiffs and the proposed Classes.

84.     Defendants directly marketed to Plaintiffs and the proposed Classes through statements on their websites, labeling, advertising, and packaging.

85.     Plaintiffs and the proposed Classes are the intended beneficiaries of the expressed and implied warranties.

## CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this action individually and on behalf of the following Classes pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who are citizens of the State of Ohio who, from July 1, 2013, to the present, purchased the Contaminated Cat Foods for household or business use, and not for resale (the "Ohio Class").

> All persons who are citizens of the State of Illinois who, from July 1, 2013, to the present, purchased the Contaminated Cat Foods for household or business use, and not for resale (the "Illinois Class").

87.     Excluded from the Classes are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

88.     This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

89.     The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of the Classes in a single action will provide substantial benefits to the parties and Court.

90.     Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a)     whether Defendants owed a duty of care to Plaintiffs and the Classes;

(b)     whether Defendants knew or should have known that the Contaminated Cat Foods contained heavy metals;

(c)     whether Defendants knew or should have known that the Contaminated Cat Foods contained BPA;

(d)     whether Defendants wrongfully represented and continue to represent that the Contaminated Cat Foods are natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients" that are guaranteed "to keep your cat or kitten healthy, happy, and strong";

(e)     whether Defendants wrongfully represented and continue to represent that the Contaminated Cat Foods are healthy, superior quality, nutritious, and safe for consumption;

(f)     whether Defendants wrongfully represented and continue to represent that the manufacturing of the Contaminated Cat Foods is subjected to rigorous standards, including temperature;

(g)     whether Defendants wrongfully failed to state that the Contaminated Cat Foods contained heavy metals and/or BPA;

(h)     whether Defendants' representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

(i)     whether those representations are likely to deceive a reasonable consumer;

(j)     whether a reasonable consumer would consider the presence of heavy metals and/or BPA as a material fact in purchasing pet food;

(k)     whether Defendants had knowledge that those representations were false, deceptive, and misleading;

(l)     whether Defendants continue to disseminate those representations despite knowledge that they are false, deceptive, and misleading;

(m)     whether a representation that a product is healthy, superior quality, nutritious, and safe for consumption and does not contain arsenic and/or lead is material to a reasonable consumer;

(n)     whether Defendants' representations and descriptions on the labeling of the Contaminated Cat Foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(o)     whether Defendants breached their express warranties;

(p)     whether Defendants breached their implied warranties;

(q)     whether Defendants made negligent misrepresentations;

(r)     whether Defendants violated the Ohio Consumer Sales Practices Act;

(s)     whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

(t)     whether Defendants made fraudulent omissions;

(u)     whether Defendants were unjustly enriched;

(v)     whether Plaintiffs and the members of the Classes are entitled to actual, statutory, and punitive damages; and

(w)     whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

91.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

92.     Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

93.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

94.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

95.     Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

96.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Express Warranty against Defendants on Behalf of the Classes**

97.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

98.     Defendants marketed and sold their Contaminated Cat Foods in to the stream of commerce with the intent that they would be purchased by Plaintiffs and members of the Classes.

99.     Defendants expressly warranted, advertised, and represented to Plaintiff and the Class that their Contaminated Cat Foods are:

(a)     Natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients;"

(b)     Nutritious, superior quality, healthy, and safe for consumption;

(c)     Guaranteed "to keep your cat or kitten healthy, happy, and strong."

(d)     "Subject to the highest standards of authenticity, nutritional integrity, and food safety."

100.    Defendants made these express warranties regarding the Contaminated Cat Foods' quality, ingredients, and fitness for consumption in writing through their website, advertisements, and marketing materials and on the Contaminated Cat Foods' packaging and labels.  These express warranties became part of the basis of the bargain Plaintiffs and the Classes entered in to upon purchasing the Contaminated Cat Foods.

101.    Defendants' advertisements, warranties, and representations were made in connection with the sale of the Contaminated Cat Foods to Plaintiffs and the Classes.  Plaintiffs and the Classes relied on Defendants' advertisements, warranties, and representations regarding the Contaminated Cat Foods when deciding whether to purchase Defendants' products.

102.    Defendants' Contaminated Cat Foods do not conform to Defendants' advertisements, warranties and representations in that they:

      (a)    Are not natural or safe for consumption by humans or felines;

      (b)    Contain levels of various heavy metals; and

      (c)    Contain levels of BPA.

103.    Defendants were on notice of this breach as they were aware of the included heavy metals and/or BPA in the Contaminated Cat Foods and based on the public investigation by the Clean Label Product that showed their products contain heavy metals and/or BPA.

104.    Privity exists because Defendants expressly warranted to Plaintiffs and the Classes that the Contaminated Cat Foods were natural, suitable for consumption, and guaranteed to keep their cats healthy, happy, and strong.

105.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered actual damages in that they purchased Contaminated Cat Foods that are worth less

than the price they paid and that they would not have purchased at all had they known of the presence of heavy metals and/or BPA.

106.     Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT II
**Breach of Implied Warranty of Merchantability against Defendants on Behalf of the Classes**

107.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

108.     Defendants are merchants engaging in the sale of goods to Plaintiffs and the Classes.

109.     There was a sale of goods from Defendants to Plaintiffs and the members of the Classes.

110.     At all times mentioned herein, Defendants manufactured or supplied the Contaminated Cat Foods.  Prior to the time the Contaminated Cat Foods were purchased by Plaintiffs and the members of the Classes, Defendants impliedly warranted to them that the Contaminated Cat Foods were of merchantable quality and conformed to the promises and affirmations of fact made on the Contaminated Cat Foods' containers and labels, including that the food was:

> (a)     Natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients;"
>
> (b)     Nutritious, superior quality, , healthy, and safe for consumption;
>
> (c)     Guaranteed "to keep your cat or kitten healthy, happy, and strong."
>
> (d)     "Subject to the highest standards of authenticity, nutritional integrity, and food safety."

111.     Plaintiffs and the Classes relied on Defendants' promises and affirmations of fact when they purchased the Contaminated Cat Foods.

112.     The Contaminated Cat Foods that Defendants delivered to Plaintiffs and the Classes also did not conform to affirmations of fact that they were natural because they contained the industrial chemical BPA.

113.     Defendants breached the implied warranties by selling the Contaminated Cat Foods that failed to conform to the promises or affirmations of fact made on the container or label as each product contained heavy metals and BPA.

114.     Defendants were on notice of this breach as they were aware of the heavy metals and BPA included in the Contaminated Cat Foods and based on the public investigation by the Clean Label Product that showed their products contain heavy metals and BPA.

115.     Privity exists because Defendants impliedly warranted to Plaintiffs and the Classes through the warranting, packaging, advertising, marketing, and labeling that the Contaminated Cat Foods healthy, natural, and suitable for consumption and by failing to mention the presence of heavy metals or BPA.

116.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered actual damages in that they have purchased Contaminated Cat Foods that is worth less than the price they paid and that they would have not have purchased at all had they known of the presence of heavy metals and/or BPA.

117.     Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' failure to deliver goods conforming to their implied warranties and resulting breach.

<u>**COUNT III**</u>
**Negligent Misrepresentation against Defendants on Behalf of the Classes**

118.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

119.     Defendants had a duty to Plaintiffs and the Classes to exercise reasonable and ordinary care in the formulation, testing, formulation, manufacture, marketing, distribution, and sale of the Contaminated Cat Foods.

120.     Defendants breached their duty to Plaintiffs and the Classes by formulating, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs that did not have the ingredients, qualities, characteristics, and suitability for consumption as advertised by Defendants and by failing to promptly remove the Contaminated Cat Foods from the marketplace or to take other appropriate remedial action.

121.     Defendants knew or should have known that the ingredients, qualities, and characteristics of the Contaminated Cat Foods were not as advertised or suitable for their intended use, consumption by cats, and were otherwise not as warranted and represented by Defendants. Specifically, Defendants knew or should have known that: (1) the certain of the Contaminated Cat Foods were not natural because they contained levels of the BPA; (2) the Contaminated Cat Foods were not nutritious, superior quality, pure, natural, healthy and safe for consumption because they contained high levels of heavy metals; and (3) and the Contaminated Cat Foods were otherwise not as warranted and represented by Defendants.

122.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered actual damages in that they purchased Contaminated Cat Foods that were worth less than the price they paid and that they would not have purchased at all had they known they contained heavy metals and/or BPA.

123.    Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## COUNT IV
## Fraud against Defendants on Behalf of the Classes

124.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

125.    Defendants falsely represented to Plaintiffs and the Classes that their Contaminated Cat Foods are:

(a)    Natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients;"

(b)    Nutritious, superior quality, natural, healthy, and safe for consumption;

(c)    Guaranteed "to keep your cat or kitten healthy, happy, and strong."

(d)    "Subject to the highest standards of authenticity, nutritional integrity, and food safety."

126.    Defendants intentionally and knowingly made these misrepresentations to induce Plaintiffs and the Classes to purchase their Contaminated Cat Foods.

127.    Defendants knew that their representations about the Contaminated Cat Foods were false in that the Contaminated Cat Foods contain levels of heavy metals and BPA. Defendants allowed their packaging, labels, advertisements, promotional materials, and website to intentionally mislead consumers, such as Plaintiffs and the Classes.

128.    Plaintiffs and the Classes relied on these misrepresentations and purchased the Contaminated Cat Foods to their detriment. Given the deceptive manner in which Defendants advertised, represented, and otherwise promoted the Contaminated Cat Foods, the reliance by Plaintiffs and the members of the Classes on Defendants' misrepresentations was justifiable.

129.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered actual damages in that they have purchased Contaminated Cat Foods that are worth less than the price they paid and that they would not have purchased at all had they known of the presence of heavy metals and/or BPA.

130.     Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### COUNT V
**Violations of Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code § 1345.01, *et seq*., against Defendants on Behalf of the Class**

131.     Plaintiff Leppert incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.     Plaintiff Leppert and each Ohio Class members is a "person," as that term is defined in Ohio Revised Code section 1345.01(B).

133.     A consumer transaction is defined as a "sale… of an item of goods… to an individual for purposes that are primarily personal, family, or household…" Ohio Rev. Code § 1345.01(A).

134.     Defendants are a "person," as that term is defined in Ohio Revised Code section 1345.01(B).

135.     Defendants' conduct alleged herein violates OCSPA section 1345.02(B)(2) by representing that the Contaminated Cat Foods are of a particular standard, quality, or grade when they in fact contain levels of heavy metals and BPA.

136.     Specifically, Defendants falsely claim, on both their labels and their websites, that their Contaminated Cat Foods are:

> (a)     Natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients;"

(b)     Nutritious, superior quality, , healthy, and safe for consumption;

(c)     Guaranteed "to keep your cat or kitten healthy, happy, and strong."

(d)     "Subject to the highest standards of authenticity, nutritional integrity, and food safety."

137.    Defendants' unlawful conduct is continuing.

138.    Defendants intended for Plaintiff Leppert and the Ohio Class members to rely on and accept as true these advertisements and representations in deciding whether to purchase the Contaminated Cat Foods, and at what price.

139.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive consumers with respect to the Contaminated Cat Foods' quality, ingredients, and suitability for consumption by cats.

140.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to cause consumers to purchase and/or overpay for the Contaminated Cat Foods.

141.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive Plaintiff Leppert and the Ohio Class with respect to the Contaminated Cat Foods' quality, ingredients, and suitability for consumption by cats.

142.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive and cause Plaintiff Leppert and the Ohio Class members to purchase the Contaminated Cat Foods.

143.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive and cause Plaintiff Leppert and the Ohio Class members to purchase and/or overpay for the Contaminated Cat Foods.

144.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct described herein repeatedly occurred in Defendants' trade or business and were capable of deceiving a substantial portion of the consuming public.

145.    The facts misrepresented, concealed, or not disclosed by Defendants with respect to the presence of heavy metals and/or BPA are material facts because Plaintiff Leppert and any reasonable consumer would have considered those facts important when deciding whether to purchase the Contaminated Cat Foods, and at what price.

146.    If Plaintiff Leppert and the Ohio Class members had known that the Contaminated Cat Foods did not in fact match the quality and ingredients described above, they would not have paid the price premium they paid for the Contaminated Cat Foods.

147.    If Plaintiff Leppert and the Ohio Class members had known that the Contaminated Cat Foods did not in fact match the quality and ingredients described above, they would not have purchased the Contaminated Cat Foods.

148.    As a result of Defendants' conduct, Plaintiff Leppert and the Ohio Class members have suffered actual damages, in that they purchased Contaminated Cat Foods at a price far greater than they would have paid if they had knowledge of the levels of heavy metals and/or BPA present in the Contaminated Cat Foods.

149.    As a result of Defendants' conduct, Plaintiff Leppert and the Ohio Class members have suffered actual damages, in that they purchased Contaminated Cat Foods that they would not have purchased at all if they had knowledge of the levels of heavy metals and/or BPA present in the Contaminated Cat Foods.

150.    As a direct and proximate result of these violations, Plaintiff Leppert and the Ohio Class have been harmed, and that harm will continue unless Defendants are enjoined from using

the misleading marketing described herein in any manner in connection with the advertising and sale of the Contaminated Cat Foods.

151. Pursuant to Ohio Revised Code section 1345.09, *et seq*., Plaintiff Leppert and the Ohio Class seek injunctive and declaratory relief, actual and punitive damages, and attorneys' fees.

## COUNT VI
### Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*., against Defendants on Behalf of the Illinois Class

152. Plaintiff Chernik incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153. The conduct described in this Complaint constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*. (hereinafter, "ICFA").

154. Defendants engaged in a deceptive act or practice in violation of ICFA by knowingly misrepresenting, concealing, or failing to disclose the Contaminated Cat Foods' true quality, ingredients, and suitability for consumption by cats.

155. Specifically, Defendants falsely claim, on both their labels and their websites, that their Contaminated Cat Foods are:

(a) Natural, fit for human consumption, fit for feline consumption, and made from "Biologically Appropriate" and "Fresh Regional Ingredients;"

(b) Nutritious, superior quality, , healthy, and safe for consumption;

(c) Guaranteed "to keep your cat or kitten healthy, happy, and strong."

(d) "Subject to the highest standards of authenticity, nutritional integrity, and food safety."

156. Defendants' deceptive acts and practices are continuing.

157.    Defendants intended for Plaintiff Chernik and the Illinois Class members to rely on and accept as true these advertisements and representations in deciding whether to purchase the Contaminated Cat Foods, and at what price.

158.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive consumers with respect to the Contaminated Cat Foods' quality, ingredients, and suitability for consumption by cats.

159.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to cause consumers to purchase and/or overpay for the Contaminated Cat Foods.

160.    Defendants' misrepresentations, concealment, omissions, and other deceptive acts occurred before Plaintiff Chernik and the Illinois Class decided to purchase the Contaminated Cat Foods.

161.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive Plaintiff Chernik and the Illinois Class with respect to the Contaminated Cat Foods' quality, ingredients, and suitability for consumption by cats.

162.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive and cause Plaintiff Chernik and the Illinois Class members to purchase the Contaminated Cat Foods.

163.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive and cause Plaintiff Chernik and the Illinois Class members to purchase and/or overpay for the Contaminated Cat Foods.

164. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct described herein repeatedly occurred in Defendants' trade or business and were capable of deceiving a substantial portion of the consuming public.

165. The facts misrepresented, concealed, or not disclosed by Defendants with respect to the presence of heavy metals and/or BPA are material facts because Plaintiff Chernik and any reasonable consumer would have considered those facts important in deciding whether to purchase the Contaminated Cat Foods, and at what price.

166. If Plaintiff Chernik and the Illinois Class members had known that the Contaminated Cat Foods did not in fact match the quality and ingredients described above, they would not have paid the price premium they paid for the Contaminated Cat Foods.

167. If Plaintiff Chernik and the Illinois Class members had known that the Contaminated Cat Foods did not in fact match the quality and ingredients described above, they would not have purchased the Contaminated Cat Foods at all.

168. As a result of Defendants' conduct, Plaintiff Chernik and the Illinois Class members have suffered actual damages, in that they purchased Contaminated Cat Foods at a price far greater than they would have paid if they had knowledge of the levels of heavy metals and/or BPA present in the Contaminated Cat Foods.

169. As a result of Defendants' conduct, Plaintiff Chernik and the Illinois Class members have suffered actual damages, in that they purchased Contaminated Cat Foods that they would not have purchased at all if they had knowledge of the levels of heavy metals and/or BPA present in the Contaminated Cat Foods.

170. As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendants set forth above, Plaintiff Chernik and the Illinois Class

members are entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs, as set forth in Section 10a of the ICFA.

171.    Defendants' deceptive, misleading, unfair, and unconscionable practices set forth above were done willfully, wantonly, and maliciously entitling Plaintiff Chernik and the Illinois Class members to an award of punitive damages.

<u>**COUNT VII**</u>
**Fraudulent Omission against Defendants on Behalf of the Classes**

172.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

173.    Defendants concealed from and failed to disclose to Plaintiffs and the Classes that their Contaminated Cat Foods contained heavy metals and/or BPA.

174.    Defendants were under a duty to disclose to Plaintiffs and members of the Classes the true quality, characteristics, ingredients, and suitability for consumption of the Contaminated Cat Foods because: (1) Defendants were in a superior position to know the true state of facts about their product; (2) Defendants were in a superior position to know the actual ingredients, characteristics, and suitability of the Contaminated Cat Foods; and (3) Defendants knew that Plaintiffs and the Classes could not reasonably have been expected to learn or discover that the Contaminated Cat Foods were misrepresented in the packaging, labels, advertising, and website prior to purchasing the Contaminated Cat Foods.

175.    The facts concealed or not disclosed by Defendants to Plaintiffs and the Classes are material in that a reasonable consumer would have considered them important when deciding whether to purchase the Contaminated Cat Foods.

176.    Plaintiffs and the Classes justifiably relied on the omissions of Defendants to their detriment.  The detriment is evident from the true quality, characteristics, and ingredients of the Contaminated Cat Foods, which is inferior than advertised and represented by Defendants.

177.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered actual damages in that they have purchased Contaminated Cat Foods that is worth less than the price they paid and that they would not have purchased at all had they known of the presence of heavy metals and/or BPA.

178.    Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VIII
### Unjust Enrichment against Defendants on Behalf of the Classes

179.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

180.    Substantial benefits have been conferred on Defendants by Plaintiffs and the Classes through the purchase of the Contaminated Cat Foods.  Defendants knowingly and willingly accepted and enjoyed these benefits.

181.    Defendants either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the Contaminated Cat Foods would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendants.  As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

182.    Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and the Classes.

183.    Plaintiffs and the Classes are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

184.    Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendants to bear the costs of class notice;

B.    An order enjoining Defendants from selling the Contaminated Cat Foods until the levels of heavy metals and/or BPA are removed or full disclosure of the presence of such appear on all labels, packaging and advertising;

C.    An order enjoining Defendants from selling the Contaminated Cat Foods in any manner suggesting or implying that they are healthy, natural, and safe for consumption;

D.    An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.    An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of Ohio or Illinois law, plus pre- and post-judgment interest thereon;

G. An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H. An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

I. An order requiring Defendants to pay punitive damages on any count so allowable;

J. An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiffs and the Classes; and

K. An order providing for all other such equitable relief as may be just and proper.

<u>**JURY DEMAND**</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

**LITE DEPALMA GREENBERG, LLC**

Dated: June 22, 2018

   */s/ Katrina Carroll*
Katrina Carroll
Kyle A. Shamberg
111 W Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
kcarroll@litedepalma.com
kshamberg@litedepalma.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Robert K. Shelquist
Rebecca A. Peterson (241858)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

**ROBBINS ARROYO LLP**
Kevin A. Seely (199982)
Steven M. Mckany (271405)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
kseely@robbinsarroyo.com
smckany@robbinsarroyo.com


**CUNEO GILBERT & LADUCA, LLP**
Charles Laduca
Katherine Van Dyck
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
kvandyck@cuneolaw.com
charles@cuneolaw.com

**ANDREWS DEVALERIO LLP**
Glen Devalerio
Daryl Andrews
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: (617) 936-2796
glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com

**POMERANTZ LLP**
Gustavo F. Bruckner
Samuel J. Adams
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
gfbruckner@pomlaw.com
sjadams@pomlaw.com

*Attorneys for Plaintiffs*