IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH LEPPERT and ZACHARY CHERNIK, individually and on behalf of a class of similarly situated individuals, | ) ) ) | No. 18 C 4347 |
| | ) | |
| *Plaintiffs*, | ) | Hon. Virginia M. Kendall |
| V. | ) | |
| | ) | |
| CHAMPION PETFOODS USA INC. and CHAMPION PETFOODS LP, | ) ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Deborah Leppert and Zachary Chernik filed a class action suit against Defendants Champion Petfoods USA Inc. and Champion Petfoods LP on behalf of two putative classes, one consisting of citizens of Ohio ("Ohio Class") and the second of citizens of Illinois ("Illinois Class"). (Dkt. 1). The Complaint alleges state law claims for breach of express warranty (Count I), breach of implied warranty of merchantability (Count II), negligent misrepresentation (Count III), common law fraud (Count IV), fraudulent omission (Count VII), and unjust enrichment (Count VIII) on behalf of both classes; a claim for violation of the Ohio Consumer Sales Practices Act (OCSPA), Ohio Rev. Code Ann. § 1345.01, *et seq*., on behalf of the putative Ohio Class (Class V); and a claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1, *et seq*., on behalf of the putative Illinois Class (Count VI). (*Id.*). Defendants moved to dismiss all claims brought by Plaintiff Leppert and the putative Ohio Class (Counts I–V, VII–VIII) pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction; the claims for breach of express or implied warranty (Counts I–II), negligent misrepresentation (Count III), unjust enrichment (VIII), and a violation of OCSPA (Count V) for

failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6); and all claims sounding in fraud (Counts IV, VI, and VII) for failure to state a claim with particularity as required under Federal Rule of Civil Procedure 9(b).  (Dkt. 21).  In their Response to Defendants' Motion to Dismiss, Plaintiffs agreed to dismiss their negligent misrepresentations claim (Count III).  (Dkt. 23 at 12, n.12).   For the following reasons, Defendants' Motion to Dismiss is granted in part and denied in part.

## **BACKGROUND**

The following facts are based on the allegations in the Complaint as well as the May 2017 White Paper referred to in and attached (via an embedded link) to the Complaint and also attached to Defendants' Motion to Dismiss.  (Dkt. 1; Dkt., 21-1); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 809 (7th Cir. 2018) ("A court deciding a motion to dismiss under Rule 12(b)(6) may consider documents that are attached to a complaint or that are central to the complaint, even if not physically attached to it.").  The Court accepts all well-pleaded facts in the Complaint as true for purposes of the Motion to Dismiss and draws all inferences in favor of Plaintiff.  *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010).

Defendants manufacture, market, advertise, label, distribute and sell pet food, including its cat food brand names Orijen and Acana, throughout the United States.  (Dkt. 1 at ¶ 1).  Defendants market the Origen and Acana brands as being "Biologically Appropriate," made from "Fresh Regional Ingredients," and "guaranteed to keep your cat or kitten health, happy, and strong." (*See id.* at ¶ 19).   The packaging states the cat foods are "meat-based foods that mirror your cat's evolutionary diet" excluding anything "that nature did not intend your cat to eat."  (*Id.* at ¶ 7).   The

packaging states also that the cat foods are made with proteins "deemed fit for human consumption before inclusion into Origen ingredients." (*Id.* at ¶ 9). Defendants charge a premium for these purportedly higher-quality cat foods. (*Id.* at ¶ 3).

On their website, Defendants advertise that they make their pet foods in their own "award-winning kitchens" featuring "state-of-the-art fresh food-processing technologies" and are "dedicated to the highest standards of authenticity, nutritional integrity, and food safety." (*Id.* at ¶ 62). Since 2016, Defendants have produced all Acana and Orijen pet foods sold in the United States in their DogStar Kitchens facility in Bowling Green, Kentucky. (*Id.* at ¶ 57). Defendants tout this facility as having "the most advanced pet food kitchens on earth, with standards that rival the human food processing industry" and which meet the EU's and Canada's standards for pet food ingredient processing as well as the "strictest standards with ingredient suppliers approved by the [USDA] and [FDA]." (*Id.* at ¶¶ 20, 57, 59).

Nowhere on the packaging or in any advertising or marketing do Defendants disclose that the cat foods contain levels of arsenic, mercury, lead, cadmium and/or bisphenol A ("BPA") at levels "known to pose health risks to humans and animals." (*Id.* ¶ 6). Specifically, the cat foods are known to contain—presumably based on third-party scientific testing[1]—the following levels of heavy metals and BPA:

| Product Name | Arsenic (ug/kg) | BPA (ug/kg) | Cadmium (ug/kg) | Mercury (ug/kg) | Lead (ug/kg) |
|---|---|---|---|---|---|
| ACANA Regional Appalachian Ranch | 385.00 | 141.50 | 32.60 | 9.40 | 418.10 |
| ACANA Regionals Grasslands | 405.80 | 139.00 | 39.50 | 14.30 | 407.60 |
| ACANA Regionals Meadowland | 959.20 | 233.80 | 39.30 | 13.40 | 310.40 |

---

[1] Plaintiffs do not specifically cite the source of this data in ¶ 6 but state generally later in the Complaint that "after conducting third party scientific testing, it is clear that the Contaminated Cat Foods do in fact contain levels of both heavy metals and BPA." (*Id.* at ¶ 69).

| | | | | | |
|---|---|---|---|---|---|
| ACANA Regionals Pacifica | 2504.50 | 173.60 | 79.30 | 48.80 | 34.00 |
| ACANA Regionals Wild Atlantic | 3639.40 | 134.60 | 105.30 | 45.50 | 245.40 |
| Orijen Cat & Kitten | 821.20 | 140.60 | 103.10 | 13.30 | 194.10 |
| Orijen Regional Red | 1086.10 | 224.00 | 68.10 | 20.80 | 342.50 |
| Orijen Six Fish | 3187.50 | 135.20 | 154.80 | 54.10 | 42.00 |

(*Id.*).  Heavy metals such as arsenic, cadmium, mercury and lead can cause serious illness to humans and animals.  (*Id.* at ¶ 47).  BPA has also been linked to various health issues, including reproductive disorders, heart disease, diabetes, cancer, and neurological problems. (*Id.* at ¶ 28).

Defendants knew their cat food products contained heavy metals and BPA.  The Clean Label Project found and informed Defendants that their dog and cat food products contained higher levels of heavy metals when compared to other pet foods.  (*Id.* at ¶ 77).  In response to these findings, Defendants issued a White Paper entitled "Orijen and Acana Foods in Comparison to Pet Food Safety Standards" acknowledging the presence of heavy metals and BPA in their Orijen and Acana cat food products.  (*Id.* at ¶ 78; Dkt. 21-1 at 2).  In the White Paper, Defendant stated that they "systematically test" test their Orijen and Acana products for heavy metals in third-party laboratories and reported data from the last three years of third-party testing that shows heavy metals are present in their products only at levels lower than the maximum tolerable limits (MTLs) for animals set by the National Research Council (NRC) and/or FDA:

| Heavy Metal | Average (mg/kg) | Standard Deviation (mg/kg) | NRC/FDA MTL (mg/kg) |
|---|---|---|---|
| Arsenic | 1.36 | 1.37 | 12.50 |
| Cadmium | 0.09 | 0.09 | 10.00 |
| Lead | 0.17 | 0.14 | 10.00 |
| Mercury | 0.03 | 0.03 | 0.27 |

(Dkt. 1 at ¶ 78; Dkt. 21-1 at 2). Defendants contend such levels of heavy metals in pet foods are acceptable and did not change the packaging, labeling, advertising or marketing of their Orijen or Acana brands to disclose the White Paper findings. (Dkt. 1 at ¶¶ 79-80).

Plaintiff Chernik is a citizen of Illinois and purchased Orijen and Acana cat foods for his two cats from his local pet food stores every 10-12 weeks from 2006 through 2016. (*Id.* at ¶ 41). Plaintiff Leppert is a citizen of Ohio and purchased Orijen cat foods for her two cats every month from 2011 through 2018 from a pet store in Powell, Ohio. (*Id.*at ¶ 39). Both Plaintiffs saw the nutritional claims on the packaging before purchasing the cat food, relied on those claims in deciding to purchase the cat food, and would not have purchased the cat food had Defendants disclosed that it contained heavy metals, chemicals or toxins. (*Id.* at ¶¶ 39–42). Since consuming Orijen cat food, one of Plaintiff Leppert's cats suffered from gastrointestinal issues that required surgery and the other was diagnosed with chronic kidney disease. (*Id.* at ¶ 39).

Plaintiffs Chernik and Leppert bring their claims individually and on behalf of all citizens of Illinois and Ohio, respectively, who purchased the "contaminated" cat food from July 1, 2013 to the present. (*Id.* at ¶ 86).

## DISCUSSION

### I.    Motion to Dismiss Claims Brought by Plaintiff Leppert and the Putative Ohio Class for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)

Defendant Champion Petfoods USA Inc. is incorporated in Delaware with its headquarters and principal place of business in Auburn, Kentucky. (*Id.* at ¶ 43). Defendant Champion Petfoods LP is a Canadian limited partnership with its headquarters and principal place of business in Edmonton, Alberta. (*Id.* at ¶ 44). Defendants argue this Court lacks personal jurisdiction over them as to the claims brought by Plaintiff Leppert and the putative Ohio Class.

Rule 12(b)(2) permits dismissal for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). A plaintiff need not anticipate a personal jurisdiction challenge in its complaint; however, once challenged, the plaintiff bears the burden of demonstrating that personal jurisdiction exists. *See John Crane, Inc. v. Shein Law Ctr.*, Ltd., 891 F.3d 692, 695 (7th Cir. 2018). A plaintiff can establish personal jurisdiction over a defendant in two ways: through general or specific jurisdiction. *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017). "General personal jurisdiction exists where the defendants are 'at home' in the forum state, and specific personal jurisdiction depends on the lawsuit arising out of or relating to the defendants' contacts with the forum." *Burmaster v. Herman*, 737 F. App'x 790, 791 (7th Cir. 2018) (citing *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017)). Plaintiffs do not contend general jurisdiction exists (*see* Dkt. 23 at 2–4), so the Court need only address specific jurisdiction.

"Specific jurisdiction requires a defendant's contacts with the forum State to be directly related to the conduct pertaining to the claims asserted." *Brook*, 873 F. 3d at 552. "The inquiry must focus on 'the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014)). There must be an "affiliation between the forum and the underlying controversy, principally [an] activity or an occurrence that takes place within the forum State." *Bristol-Myers*, 137 S. Ct. at 1781 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Defendants assert this Court lacks specific jurisdiction over Defendants as to the state law claims brought by the nonresident Plaintiff Leppert and the putative Ohio Class members under *Bristol-Myers*. 137 S. Ct. 1773 (2017). In *Bristol-Myers*, a group of more than 600, mostly nonresident plaintiffs filed a mass-tort action in California state court asserting various state law claims based on injuries allegedly caused by Bristol-Myers Squibb Co.'s drug Plavix. *Id.* at 1777.

The state supreme court held that while the trial court had no general jurisdiction over the nonresident plaintiffs' claims, specific personal jurisdiction existed because the nonresident plaintiffs' claims were based on the same allegedly defective product and misleading marketing of Plavix as the resident plaintiffs' claims. *Id.* at 1779. The Supreme Court reversed, applying "settled principles regarding specific jurisdiction" and reasoning that the state supreme court had found specific jurisdiction existed "without identifying any adequate link between the State and the nonresidents' claims" as required under the Fourteenth Amendment:

> The mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresident' claims. As we have explained, 'a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.' This remains true even when third parties (here, the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents . . . What is needed—and what is missing here—is a connection between the forum and the specific claims at issue.

*Id.* at 1781 (quoting *Walden*, 571 U.S. at 286). The Supreme Court held, therefore, that the state court lacked specific personal jurisdiction over state law claims brought by nonresident defendants where "all conduct giving rise to the nonresidents' claims occurred elsewhere." *Id.* at 1782. The Supreme Court specifically left open the question of "whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784.

In diversity jurisdiction cases such as this one, personal jurisdiction is governed by the law of the forum state, *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014), and here, the Illinois long-arm statute permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment. *See Brook*, 873 F.3d at 552; 735 Ill. Comp. Stat. 5/2-209(c). Therefore, *Bristol-Myers*' holding with regard to the Fourteenth Amendment's limits to the personal jurisdiction of state courts applies.

Plaintiffs argue *Bristol-Myers* does not extend to multistate class actions in federal court because the same concerns animating the Supreme Court's decision as to the mass-tort claims in state court—federalism and the "burden on the defendant"—are not at issue. In *Bristol-Myers*, the Supreme Court explained that in determining whether personal jurisdiction is present, a court must consider the interests of the forum State, the plaintiff and the defendant, but the "primary concern is the burden on the defendant." 137 S. Ct. at 1780. In assessing this burden, the court must consider "the practical problems resulting from litigating in the forum" as well as the "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." *Id.* Such considerations are arguably less cause for concern in a class action brought in federal court where Rule 23 requires commonality among the claims Defendants must defend against and the "coercive power" of any individual State is not at issue. But nothing in *Bristol-Myers* suggests the general principle it stands for—that due process requires "a connection between the forum and the specific claims at issue"—does *not* apply to nonresident claims in a multistate class action brought in federal court. Moreover, as this Court has recognized, a defendant's due process rights should remain constant regardless of the suit against him, be it an individual, mass, or class action. *See Florence Mussat, M.D., S.C., et al. v. IQVIA Inc., et al.*, No. 17 C 8841, 2018 WL 5311903, at *5 (N.D. Ill. Oct. 26, 2018).

The "settled principles" applied in *Bristol Myers* lead to the same conclusion here: no specific jurisdiction over the nonresident plaintiffs' claims exists. Plaintiffs do not allege that Leppert or any member of the putative Ohio Class saw Defendants' marketing or advertisements in Illinois, purchased Defendants' cat food in Illinois, or suffered any injury in Illinois. Rather, according to the Complaint, all conduct giving rise to the nonresidents' claims occurred in Ohio. *See Bristol-Myers*, 137 S. Ct. at 1781–82. Therefore, Plaintiffs fail to identify any link between

Illinois and the specific nonresident claims that due process requires. *See id.* The fact that the nonresident claims are based on the same product and marketing as the resident claims is insufficient. *See id.* Also, as in *Bristol-Myers*, dismissing the nonresident claims for lack of personal jurisdiction does not prevent plaintiffs from filing a multistate class action in a forum with general jurisdiction over Defendants, such as Kentucky. *See id.* at 1783 ("Our decision does not prevent the California and out-of-state plaintiffs from joining together in a consolidated action in the States that have general jurisdiction over BMS.").

Finally, Plaintiffs argue in a footnote that the Court should exercise pendent jurisdiction over the nonresident claims because they are based on a common nucleus of operative facts as the resident plaintiffs' claims. (*See* Dkt. 23 at 4, n.6). The Seventh Circuit has recognized the doctrine of pendent personal jurisdiction, which permits a court that has specific personal jurisdiction over a defendant for one claim to exercise personal jurisdiction over that defendant as to another claim for which personal jurisdiction may otherwise be lacking if those claims arise out of a common nucleus of facts. *See Robinson Eng'g Co. Pension Plan & Tr. v. George*, 223 F.3d 445, 449 (7th Cir. 2000); *see also, e.g., Muir v. Nature's Bounty (DE), Inc.*, No. 15 C 9835, 2018 WL 3647115, at *4 (N.D. Ill. Aug. 1, 2018). Pendent personal jurisdiction is most often invoked where an anchor federal claim provides for nationwide service of process. *See Robinson Eng'g Co.*, 223 F.3d at 449. Plaintiffs allege no such federal law claims here. Although at least one court in this district has applied the doctrine in a diversity case where the anchor claim is based solely on state law, *see Rice v. Nova Biomedical Corp.*, 763 F. Supp. 961, 966 (N.D. Ill. 1991), *aff'd*, 38 F.3d 909 (7th Cir. 1994), *Bristol-Myers* has since precluded courts sitting in diversity from exercising personal jurisdiction, pendent or otherwise, over any state-law claims against a nonresident defendant for which there is no connection between the forum and the specific claims. *See, e.g.*,

*Muir*, 2018 WL 3647115, at *5. Therefore, the Court declines to exercise pendent personal jurisdiction over the nonresident claims.

The Court finds that *Bristol-Myers* applies here and dismisses Plaintiff Leppert's nonresident state-law claims brought individually and on behalf of the putative Ohio Class for lack of personal jurisdiction pursuant to Rule 12(b)(2).

## II.    Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6)

"To survive a motion to dismiss under 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief . . . by providing allegations that 'raise a right to relief above the speculative level.'" *E.E.O.C. v. Concentra Health Servs., Inc*., 496 F.3d 773, 777 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555) (emphasis in original). The Court construes the complaint "in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in her favor." *Reynolds*, 623 F.3d at 1146. "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 566 U.S. at 678).

Defendants first move to dismiss all claims under Rule 12(b)(6) on the grounds that Plaintiffs fail to state sufficient facts to support their underlying theory of the case. Defendants then address individually the breach of express and implied warranty and unjust enrichment claims

under 12(b)(6).  The Court addresses these claims in turn below, applying Illinois law since all claims by nonresident Ohio plaintiffs have been dismissed for lack of personal jurisdiction.

## A.    All Claims

Defendants first challenge all of Plaintiffs claims under Rule 12(b)(6), arguing that Plaintiffs fail to allege that heavy metals or BPA were present at a level unsafe for pet consumption—an allegation which, according to Defendants, is "fatal" since none of Defendants' statements identified in the Complaint are rendered deceptive or misleading by the mere presence of heavy metals or BPA.  (Dkt. 21 at 5–8).  Plaintiffs unsurprisingly disagree, asserting that Defendants "misconstrue the nature of this case" as one about proving physical harm to pets when, in fact, Plaintiffs allege only that Defendants' failure to disclose the presence of heavy metals and BPA in their marketing is deceptive and misleading because the mere presence of these substances is material to a reasonable consumer given their link to known harmful and toxic effects.  (Dkt. 23 at 5).  Reference to the Complaint shows that neither characterization is entirely correct.  Indeed, while the Complaint includes allegations that Defendants misled consumers as to whether its cat foods were safe for pet consumption, Plaintiffs' claims go beyond pet safety alleging also that Defendants misled consumers as to whether their cat foods were healthy, natural, and high quality. (*See, e.g.,* Dkt. 1 at ¶ 34 ("Defendants engaged in deceptive advertising" by representing that the cat foods "are *natural*, fit for human consumption, fit for feline consumption, and *made from 'Biologically Appropriate' and 'Fresh Regional Ingredients' that are guaranteed 'to keep your cat or kitten healthy, happy, and strong*.'") (emphasis added); *id.* at ¶ 40 (Plaintiffs "paid the premium price on the assumption that the labeling and marketing . . . were accurate and that they were *healthy, superior quality, natural*, and safe for cats to ingest.") (emphasis added); *id.* at ¶ 90

("Defendants wrongfully represent and continue to represent that the Contaminated Cat Foods are *healthy, superior quality, nutritious* and safe for consumption.") (emphasis added).

The Court agrees with Defendants that Plaintiffs fail to allege facts supporting any theory based on the representation that the cat food is safe for consumption by cats. As an initial matter, Defendants point to the White Paper as definitively establishing that its products do not contain unsafe levels of heavy metals. The Court may consider the White Paper at this stage because Plaintiffs attached it to their Complaint. *Cmty. Bank of Trenton*, 887 F.3d at 809. Plaintiffs rely on the White Paper to show Defendants knew their products contain heavy metals (*see* Dkt. 1 at ¶¶ 78–80), but the White Paper also purports to show that the levels of heavy metals are considered safe by FDA and NCR. (Dkt. 21-1). While the Court cannot ignore portions of the White Paper simply because they are unhelpful to Plaintiff, *see Cmty. Bank of Trenton*, 887 F.3d at 809, the Court must take all well-pleaded facts as true and draw all inferences in Plaintiffs' favor. *Reynolds*, 623 F.3d at 1146. The Court, therefore, does not take Defendants' statements in the White Paper as truth, particular here where Plaintiffs provide competing data in ¶ 6 of the Complaint and contest the White Papers' conclusions that the levels reported "do not lead to adverse effects or food safety concerns" for pets. Additionally, the White Paper does not address BPA at all.

Regardless, the Court need not rely on the White Paper to conclude Plaintiffs fail to state a claim based on representations that Orijen and Acana products are safe for consumption by cats. Such representations as to the pet food's safety can only be misleading if the cat food is in fact unsafe for consumption. Plaintiffs' allegations that the mere presence of heavy metals and BPA in the Orijen and Acana brands renders these products "unsafe" is mere speculation. In fact, Plaintiffs acknowledge that the FDA, EPA and other agencies have set specific standards for acceptable levels of these substances in certain liquids and in *human* food, and that level is not

zero.  (*See, e.g.,* Dkt. 1 at ¶¶ 10, 52).  Plaintiffs provide no reason to assume dry pet foods would be any different or that the levels reported in the data provided in ¶ 6 of the Complaint represent "unsafe" levels.  The Complaint is also devoid of any allegation that a pet was harmed due to unsafe levels of heavy metals or BPA in Defendants' cat food.[2]

Plaintiffs also cannot rely on the allegations in their Complaint that Defendants falsely marketed their cat foods as being "fit for human consumption" (*see, e.g.,* Dkt. 1 at ¶ 60) because Defendants never made such statements.  Read in full, the statements on Orijen packaging as pictured in the Complaint provide that certain proteins are "deemed fit for human consumption *before inclusion into Origen ingredients*."  (*Id.* at ¶ 9 (emphasis added)).  Plaintiffs' claims concern only the end products sold for consumption by pets and Defendants never advertised their end-product cat foods as being safe for human consumption.  Therefore, the Court dismisses without prejudice all claims based on allegations that Defendants misrepresented their cat food products as being "safe" or fit for consumption by cats.

Plaintiffs' failure to allege facts sufficiently showing heavy metals and BPA were present at "unsafe" levels does not doom Plaintiffs' remaining theories of the case based on Defendants' marketing the cat foods as healthy, natural and high quality.  It is entirely plausible that a consumer purchasing what she believes to be healthy, natural and high-quality cat food would not purchase that cat food if she knew it contained any amount of heavy metals and/or BPA.  Here, Plaintiffs theory does not rely on any particular level of heavy metals or BPA as being "unsafe" or dangerous; the mere fact that heavy metals and/or BPA are associated with potential health risk to

---

[2] The Complaint alleges the cats of Plaintiff Leppert, whose claims have been dismissed for lack of personal jurisdiction, suffered from health issues at some point after consuming the cat foods but does not allege these injuries were caused by the cat food itself.  (*See* Dkt. 1 at ¶ 39 ("Since consuming the Contaminated Ca Foods, Abagail has suffered from gastrointestinal issues that required surgery and Taikun has been diagnosed with chronic kidney disease.").

animals and humans whatsoever could lead a consumer to believe that cat food containing these substances at any level is neither healthy, natural nor high quality.

Defendants next dispute whether any of the specific statements Plaintiffs rely on in support of this theory are actionable representations of fact. The Complaint identifies several statements made in Defendants' packaging, labeling and advertising campaign for Orijen and Acana foods but relies primarily on the following statements that the cat foods are:

- "Biologically Appropriate" (*id.* at ¶¶ 19, 99, 110, 125, 155);

- made from "Fresh Regional Ingredients" (*id.*); and

- "guaranteed to keep your cat or kitten health, happy, and strong" (*id.*); and

- subject to the "highest standards of authenticity, nutritional integrity, and food safety." *(Id.*).

The Court addresses the actionability of these statements below, in the context of the specific state law claims alleged by Plaintiff.

### B. Breach of Express Warranty (Count I)

To state an express warranty claim under Illinois law, a plaintiff must allege that "a product failed to conform with an affirmative statement of fact or promise or an express description of the goods." *Anthony v. Country Life Mfg., LLC*, 70 F. App'x 379, 383 (7th Cir. 2003); 810 Ill. Comp. Stat. Ann. 5/2-313; *see also, e.g. CHS Acquisition Corp. v. Watson Coatings, Inc.*, No. 17-CV-4993, 2018 WL 3970137, at *4 (N.D. Ill. Aug. 20, 2018) ("In Illinois, an express warranty is created where (1) the seller makes an affirmation of fact or promise; (2) that relates to the goods; and (3) becomes part of the basis of the bargain between the parties.") (quotation omitted). In Count I, Plaintiffs allege the following statements constitute express warranties: that the cat foods were "Biologically Appropriate," made from "Fresh Regional Ingredients," guaranteed "to keep

you cat or kitten, healthy, happy, and strong," and are subject to "the highest standards of authenticity, nutritional integrity, and food safety." (Dkt. 1 at ¶ 99). Defendants argue none of these statements is an "affirmative fact or promise" and, therefore, cannot create an express warranty and, even if one could, Plaintiffs fail to allege any breach of such warranty.

"An affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 906 (N.D. Ill. 2013) (citing 810 Ill. Comp. Stat. 5/2–313(2)). "The decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment." *Reid*, 964 F. Supp. 2d at 906–07 (citing *Royal Bus. Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34, 41 (7th Cir. 1980)); *see also Weiss v. Rockwell Mfg. Co.*, 293 N.E.2d 375, 381 (Ill. 1973) (same)). The first constitutes a warranty; the second does not. *Id.* (citing *Weiss*, 293 N.E.2d at 281. Furthermore, statements are mere puffery or opinion if they are "empty superlatives on which no reasonable person would rely." *Id.* (quoting *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 868 (7th Cir. 1999)).

Here, the statements that the cat food is "biologically appropriate" and made from "fresh regional ingredients" are assertions of fact, of which the seller has special knowledge and the buyer is ignorant. They are exactly the type of facts about the cat food product for which the buyer would—necessarily—rely on the seller's representation. *See, e.g., Reid*, 964 F. Supp. 2d. at 906; *CHS Acquisition Corp.*, 2018 WL 3970137, at *4 (statement "promis[ing] that topping paint would have three specific characteristics that it did not actually have" constituted an express warranty). Furthermore, Plaintiffs successfully allege the cat food does not conform to these facts because it

contains heavy metals, which are associated with potential health risks and therefore not "biologically appropriate," and BPA, which is an industrial chemical and therefore neither "biologically appropriate" nor a "fresh regional ingredient." (*See id.* at ¶¶ 10, 28, 102).

Although a closer call, the same is true of the statement that the cat food will keep a cat "healthy, happy and strong." Such statements go beyond mere puffery because they convey the cat food is nutritious and safe. *See, e.g., Adkins v. Nestle Purina PetCare Co.*, 973 F. Supp. 2d 905, 922–23 (N.D. Ill. 2013) (statements that dog treats were "wholesome" and "nutritious" conveyed the safety of the treats to the consumer and, therefore, were actionable express warranties under Illinois law. However, Plaintiffs fail to allege a breach of such express warranty because, as explained already, they fail to allege the cat foods were in fact unsafe for cats to consume.

Finally, the statement that the cat foods are subject to the "highest standards" is mere "commendation" or puffery. As an initial matter, the exact statement as identified in the Complaint is that Defendants "are *dedicated* to the highest standards of authenticity, nutritional integrity, and food safety," not that they necessarily claim to adhere to such standards. (*See* Dkt. 1 at ¶ 62 (emphasis added)). This is hardly an assertion of fact as it states nothing specific or objective about the products. *See, e.g., Reid*, 964 F. Supp. 2d at 908 ("Generally, statements that ascribe specific virtues to a product that it does not possess are not considered puffing."). It is closer instead to a vague claim as to the product's quality, which under Illinois law does not create an express warranty. *See, e.g., Corwin v. Connecticut Valley Arms, Inc.*, 74 F. Supp. 3d 883, 892 (N.D. Ill. 2014) ("Opinions that a product is "premium" or "perfect" do not generally create express warranties.").

In a one-sentence footnote, Defendants argue also that the express warranty claims fail for failure to give Defendants pre-suit notice. (Dkt. 21 at 10, n.8). Illinois law requires that "a buyer

must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." 810 Ill. Comp. Stat. Ann. 5/2-607(3)(a). The notice requirement is subject to two exceptions: "[d]irect notice is not required when (1) the seller has actual knowledge of the defect of the particular product; or (2) a consumer plaintiff suffers a personal injury, in which case the notice requirement could be satisfied by filing a lawsuit against the seller." *Stella v. LVMH Perfumes & Cosmetics USA, Inc*., 564 F. Supp. 2d 833, 837 (N.D. Ill. 2008) (citations omitted); *see also Connick v. Suzuki Motor Co*., 675 N.E.2d 584, 589 (Ill. 1996) (same). Here, Plaintiffs do not claim they suffered any personal injury but argue the Complaint adequately alleges Defendants had actual knowledge of the breach on three grounds: their exclusive knowledge of the products components, the Clean Label Project, and the White Paper. (Dkt. 23 at 10–11). Plaintiffs argument fails. The notice requirement "is satisfied only where the manufacturer is somehow apprised of the trouble with the *particular* product purchased by a *particular* buyer." *Anthony*, 70 F. App'x at 384 (emphasis added) (quoting *Connick*, 675 N.E.3d at 590). "A manufacturer's knowledge of its own ingredients is insufficient under Illinois law to constitute actual knowledge of the alleged defect," *DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, at *3 (N.D. Ill. Jan. 18, 2018) (dismissing express warranty claim for failure to provide pre-suit notice), as is "generalized knowledge about the safety concerns of third parties." *Connick*, 675 N.E.2d at 590 (knowledge of unfavorable consumer watchdog report insufficient to satisfy pre-suit notice requirement); *see also, e.g., Reyes v. McDonald's Corp*., No. 06 C 1604, 2006 WL 3253579, at *3 (N.D. Ill. Nov. 8, 2006) (rejecting argument that exception to pre-suit notice requirement applies where defendants knew about the changes to its nutrition information underlying plaintiff's express warranty claim).

Plaintiffs' failure to allege they provided proper pre-suit notice to Defendants is fatal to the express warranty claim. *See Connick*, 675 N.E.2d at 591. Therefore, the Court dismisses the express warranty claim in its entirety without prejudice on these grounds.

### C.     Breach of Implied Warranty of Merchantability (Count II)

"To state a claim for breach of the implied warranty of merchantability under Illinois law, a plaintiff must allege that (1) the defendant sold goods that were not merchantable at the time of sale; (2) the plaintiff suffered damages as a result of the defective goods; and (3) the plaintiff gave the defendant notice of the defect." *Lambert v. Dollar Gen. Corp.*, No. 16 C 11319, 2017 WL 2619142, at *4 (N.D. Ill. June 16, 2017) (citing 810 Ill. Comp. Stat. 5/2-314). To be merchantable, the goods must, among other things, "conform to the promises or affirmations of fact made on the container or label if any." 810 Ill. Comp. Stat. 5/2-314(2)(f). Plaintiffs base the implied warranty claim in Count II on the same statements as the express warranty claim addressed above. (*See* Dkt. 1 at ¶ 110). Accordingly, the same reasoning applies such that Plaintiffs sufficiently alleged an actionable, assertion of fact with which the cat foods failed to conform with regard to only two of the statements: that the cat foods are "biologically appropriate" and made with "fresh regional ingredients."

Defendants seek to dismiss the implied warranty claim also on the grounds that Plaintiffs are not in privity with Defendants. (Dkt. 21 at 12). "Under the law of Illinois, privity of contract is a prerequisite to recover economic damages for breach of implied warranty." *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) (citing *Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1029–30 (Ill. 1988)). Therefore, a consumer generally can bring an implied warranty claim to recover economic damages only against the immediate seller of the good. *See, e.g., Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701, 705 (N.D. Ill. 2016) (citing *Rothe*,

518 N.E.2d at 1029). A "direct dealing" exception exists, however, where the plaintiff relies on labels or advertisements of the manufacturer. *See, e.g., In re Rust-Oleum Restore Mktg., Sales Practices & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 807 (N.D. Ill. 2016) (applying § 2-314 of the U.C.C. as adopted by Illinois); *see also, e.g., Elward*, 214 F. Supp. 3d at 705 (recognizing the "'direct relationship' exception, which applies when there are direct dealings between the manufacturer and the remote customer"). The Complaint alleges Defendants advertised their products as being "biologically appropriate" and made from "fresh regional ingredients" not only in their packaging and labeling but also on their website and in a "long-standing marketing campaign" targeted directly at consumers and that Plaintiffs relied on these statements in deciding to purchase the Orijen and Acana cat foods. (*See, e.g.,* Dkt. 1 at ¶¶ 19, 34, 65). Thus, Plaintiffs have alleged sufficient factual basis for applying the "direct dealing" exception here. *See, e.g.*, *In re Rust-Oleum*, 155 F. Supp. 3d at 807 ("direct dealing" exception applied where Plaintiffs "allege[d] a series of well-pleaded paragraphs detailing Rust-Oleum's direct marketing campaign to consumers . . . [and] that 'consumers relied upon Defendant[']s misrepresentations'").

However, the implied warranty claim ultimately fails for the same reason as the express warranty claim. Plaintiffs fail to allege they provided proper pre-suit notice. 810 Ill. Comp. Stat. Ann. 5/2-607; (*See id.* at ¶ 114 (alleging notice based only on Defendants' knowledge of their products' ingredients and the Clean Label Project)). Therefore, the Court dismisses the implied warranty claim in its entirety without prejudice on these grounds.

### D. Unjust Enrichment (Count VIII)

To state an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary*

*v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011).  Defendants argue Plaintiffs' unjust enrichment claim must fail because Plaintiffs fail to show they did not receive what was advertised; in other words, Plaintiffs got what they paid for.  (Dkt. 21 at 20).  Again, the Court agrees this is true with regard to a theory of unjust enrichment based on alleged misrepresentations about the cat foods' safety for consumption by cats. However, as already discussed, Plaintiffs have sufficiently alleged facts supporting a claim that they purchased cat food at a premium based on misleading representations that it was "biologically appropriate" and made from "fresh regional ingredients." Therefore, Plaintiffs' unjust enrichment claim (Count VIII) based on this same theory also survives.  *See id.* at 517 (recognizing that where "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim").

### III.   Motion to Dismiss Claims Sounding in Fraud for Failure to State a Claim with Particularity Pursuant to Rule 9(b)

Rule 9(b) requires a party alleging fraud to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  This heightened pleading requirement was intended to protect against the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir.2007).  Thus, pursuant to Rule 9(b), a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th 2009)).

Defendants argue primarily that the fraud claims must fail because "without pleading what levels of heavy metals and/or BPA are considered safe for pets, Plaintiffs cannot establish that [Defendants] made misrepresentations or failed to disclose any relevant information."  (Dkt. 21 at

14).   For the reasons already discussed, the Court agrees.  Plaintiffs fail under Rule 12(b)(6) to allege sufficient facts showing any misrepresentations or omissions related to the cat food's safety for consumption by cats.  These allegations necessarily fail also to meet the heightened standard under Rule 9(b).  Therefore, the Court addresses the fraud claims only with regard to Plaintiffs' other theories of liability.

Additionally, Plaintiffs' common law fraud and ICFA claims (Counts IV and VI) are based on the same representations as the express and implied warranty claims: that the cat foods were "Biologically Appropriate," made from "Fresh Regional Ingredients," guaranteed "to keep you cat or kitten, healthy, happy, and strong," and are subject to "the highest standards of authenticity, nutritional integrity, and food safety." (Dkt. 1 at ¶¶ 125, 155).   Under Illinois law, mere puffery or a statement of seller's opinion is not actionable under either a common law fraud or ICFA claim "based on the sound reasoning that no reasonable consumer would rely on such an implicit assertion as the sole basis for making a purchase."  *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (2007) ("Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud") (citing *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir.1999)).  Therefore, for the reasons explained already, the only statements that could possibly provide a basis for a common law fraud or ICFA claim are that the cat foods are "biologically appropriate" and made from "fresh regional ingredients."

Defendants argue the ICFA claim (Count VI) fails also because Plaintiff Chernik did not identify the statements he purportedly saw and relied upon, as required by Rule 9(b).  Defendants rely on *Camasta v. Jos. A. Bank Clothiers, Inc.* for support of this argument.  761 F.3d 732 (7th Cir. 2014).  In *Camasta,* the Seventh Circuit affirmed the dismissal of a plaintiff's ICFA claim where the plaintiff relied solely on his sales receipt as evidence of the allegedly deceptive

advertisement underlying his claim. *Id.* at 737–38. The appellate court reasoned that "[a] sales receipt provided to a consumer after a purchase cannot show what was supposedly advertised; the representation must have been made to him before the purchase of the merchandise." *Id.* at 738. The plaintiff in *Camasta* failed to provide any other details of the advertisement he purportedly saw and relied upon before making the purchase. Here, in contrast, while the Complaint alleges simply that Chernik "saw the nutritional claims on the packaging" (Dkt. 1 at ¶ 41), it then goes on in several paragraphs to describe in detail and even provide pictures of the specific claims on the cat food packaging. (*See, e.g., id.* at ¶¶ 7, 46 (providing images of packaging including claims that cat food is "biologically appropriate" and made with "fresh regional ingredients)). Drawing all inferences in Plaintiffs' favor as it must, the Court reasonably assumes the nutritional claims Chernik saw and relied upon included those describing the cat food as being "biologically appropriate" and made from "fresh, regional ingredients."

Lastly, Defendants argue the fraudulent omissions claim (Count VII) fails because Plaintiffs have not pled facts establishing Defendants owed any duty to disclose information concerning the levels of heavy metals and BPA in the cat foods. (Dkt. 21 at 9). To state a fraudulent omissions claim under Illinois law, "a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (*quoting Connick*, 675 N.E.2d at 593). A duty to disclose "may be based on a fiduciary relationship or a relationship of trust and confidence where defendant is in a position of influence and superiority over plaintiff" or "may arise when a defendant tells a half-truth and then becomes obligated to tell the full truth." *Id.* (quotation omitted). In Count VII, Plaintiffs allege the former: that Defendants had a duty to disclose that their cat foods contained heavy metals and/or BPA because they "were in a superior position" to know the facts about their

products including the actual ingredients and characteristics of their cat foods and knew Plaintiffs and the putative classes could not reasonably have been expected to discover their misrepresentations prior to purchasing the cat foods. (Dkt. 1 at ¶¶ 173–74). A fraudulent omissions claim based on a "relationship of trust and confidence" is particularly difficult to allege where, as here, no formal fiduciary relationship exists. *See Toulon*, 877 F.3d at 737 (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012) and recognizing that "state and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one."). Plaintiffs must allege that Defendants "exercise overwhelming influence over [them] . . . [and] asymmetric information alone does not show the degree of dominance needed to establish a special trust relationship." *Id.* (quoting *Wigod*, 673 F.3d 72–73). Count VII relies entirely on asymmetric information; Plaintiffs allege no alternative theory giving rise to a duty to disclose. Therefore, the Court dismisses Count VII without prejudice.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss (Dkt. 21) is granted in part and denied in part. The Court dismisses without prejudice all claims brought by Plaintiff Leppert individually and on behalf of the putative Ohio Class for lack of personal jurisdiction pursuant to Rule 12(b)(2). The Court likewise dismisses without prejudice all claims based on allegations that Defendants misrepresented their cat food products as being "safe" or fit for consumption by cats. Finally, the Court dismisses the claims for breach of express and implied warranty (Counts I–II) without prejudice for failure to provide the requisite pre-suit notice and dismisses the fraudulent omissions claim (Count VII) without prejudice for failure to allege a duty to disclose. Plaintiffs have until February 14, 2019 to re-plead these claims, if possible.

Absent re-pleading of the dismissed claims, only the following claims may proceed: common law fraud (Count IV), ICFA (Count VI) and unjust enrichment (Count VIII) based on the allegations that Defendants misrepresented their cat food products as being "Biologically Appropriate" and made from "Fresh Reginal Ingredients."

Hon. Virginia M. Kendall
United States District Judge

Date: January 16, 2019