UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ZACHARY CHERNIK,** individually and on behalf of a class of similarly situated individuals, | ) ) ) Case No. 1:18-cv-04347 |
| | ) |
| | ) Honorable Virginia M. Kendall |
| | ) |
| **PLAINTIFF**, | ) |
| | ) |
| v. | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| **CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP**, | ) ) ) |
| | ) |
| **DEFENDANTS**. | ) |
| . | ) |

**SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

JURISDICTION AND VENUE ..............................................................................2

PARTIES .................................................................................................................2

    A.    Plaintiff ....................................................................................................2

    B.    Defendants ...............................................................................................6

FACTUAL ALLEGATIONS ...................................................................................7

I.    MISLEADING PACKAGING CLAIMS RESULTED IN PREMIUM PRICES AND INCREASED SALES ........................................................7

II.    MISLEADING PACKAGING CLAIMS ....................................................11

    A.    "Delivering Ingredients Naturally"......................................................11

    B.    Biologically Appropriate™ ...................................................................11

    C.    "Fresh Regional Ingredients"...............................................................13

    D.    Defendants' Omissions .........................................................................13

III.    WHY PACKAGING CLAIMS AND OMISSIONS WERE MISLEADING ..................14

    A.    Heavy Metals ........................................................................................14

        1.    Presence of Heavy Metals.........................................................15

        2.    Inadequate Testing of Heavy Metals ........................................19

    B.    Non-Fresh Ingredients ..........................................................................20

    C.    Non-Regional Ingredients .....................................................................23

    D.    BPA.......................................................................................................24

    E.    Pentobarbital—Red Meat Diets ...........................................................26

        1.    Pentobarbital Was a Well-Known Risk ....................................26

        2.    Failure to Monitor .....................................................................27

        3.    Material Risk of Pentobarbital Ignored for Years.....................29

      4.     Failure to Disclose or Recall Adulterated Red Meat Diets........................29

      5.     Undisclosed Pentobarbital Risk Was Misleading......................................31

IV.    MISLEADING PACKAGING CLAIMS AND OMISSIONS MISLED AND DECEIVED CUSTOMERS ..............................................................................................32

V.     DEFENDANTS' MISLEADING PACKAGING CLAIMS AND RELATED OMISSIONS VIOLATED ILLINOIS LAWS....................................................................33

VI.    CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE....................34

VII.   DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS AND THEIR MATERIALITY ...................................................................................................35

VIII.  DEFENDANTS ACTED NEGLIGENTLY AND/OR INTENTIONALLY TO MISLEAD CONSUMERS ........................................................................................................36

CLASS ACTION ALLEGATIONS ...............................................................................................36

CLAIMS FOR RELIEF ................................................................................................................41

COUNT I - Fraud against Defendants on Behalf of the Class......................................................41

COUNT II - Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*, Against Defendants on Behalf of the Class........43

COUNT III - Unjust Enrichment Against Defendants Individually and on Behalf of the Class.............................................................................................................................................46

PRAYER FOR RELIEF ...............................................................................................................47

JURY DEMAND ...........................................................................................................................48

Exhibit 1........................................................................................................................................51

Exhibit 2........................................................................................................................................57

## INTRODUCTION

1. Plaintiff Zachary Chernik ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned attorneys, brings this Second Amended Class Action Complaint against Defendants Champion Petfoods USA, Inc. ("Defendant Champion USA") and Champion Petfoods LP ("Defendant Champion Canada") (together, "Defendants"), for their improper marketing practices, involving misleading packaging claims and misleading omissions, concerning the quality and characteristics of their cat food diets and the ingredients used to make them. Plaintiff alleges the following based upon personal knowledge as well as investigation by his counsel and discovery and as to all other matters, upon information and belief.

2. Defendants intentionally labeled their cat food to include packaging claims that targeted consumers who were willing to pay premium prices based on Defendants' representations and warranties that their cat food contained fresh, local, or regionally sourced ingredients. Among other things, these misleading packaging claims included the following:

> (a) "Biologically Appropriate™";
>
> (b) "Fresh Regional Ingredients"; and
>
> (c) "Delivering Nutrients Naturally."

3. From at least 2014 through the present, Defendants' cat food packaging included all of the above misleading packaging claims. However, these claims were misleading and fraudulently omitted that Defendants' cat foods contained and/or had a material risk of containing undisclosed and non-conforming ingredients and contaminants, such as heavy metals, a material amount of non-fresh ingredients, a material amount of non-regional ingredients, Bisphenol A ("BPA"), and pentobarbital.

4.      As a result, Defendants' misleading packaging claims and failure to warn injured reasonable consumers, such as Plaintiffs, who reasonably relied upon the misleading packaging claims when purchasing Defendants' cat food at premium prices.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides in states other than the states in which Defendants are citizens and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d) do not apply.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiff resides and suffered injury as a result of Defendants' acts in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this District, Defendants have intentionally availed themselves of the laws and markets of this District, and Defendants are subject to personal jurisdiction in this District.

## PARTIES

**A.      Plaintiff**

7.      Plaintiff is, and at all times relevant hereto has been, a citizen of the state of Illinois. Plaintiff purchased Orijen and Acana Dog Food ("Contaminated Cat Food") for his cats, Addicus, a Persian who died in June 2008, and Ashes, a 9-year-old domestic shorthair: Orijen Six Fish Dry Cat Food, Orijen Regional Red, Acana Pacifica, and Acana Wild Prairie.  Plaintiff purchased a 15-pound bag of the Contaminated Cat Food approximately every 10-12 weeks beginning in 2006 until approximately October 2016.  Plaintiff generally bought the Contaminated Cat Food at his local Pet Food Experts, Zeus and Company Pet Supplies, Inc., and Woodstock Feed and Seed. Prior to purchasing the Contaminated Cat Food, Plaintiff saw the nutritional claims on the

packaging, which he relied on when deciding whether to purchase the Contaminated Cat Food. During that time, based on the false and misleading claims, representations, advertisements and other marketing by Defendants, Plaintiff was unaware that the Contaminated Cat Food contained and/or had a risk of containing the disclosed levels of Heavy Metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements and would not have purchased the food if that had been fully disclosed.[1]

8.      As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when he paid a purchase price or a price premium for the Contaminated Cat Food that did not deliver what was promised.  He paid the premium price on the assumption that the labeling of the Contaminated Cat Food was accurate and that it was healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced.  Plaintiff would not have paid this money had he known that the Contaminated Cat Food contained and/or had risk of inclusion of levels of the Heavy Metals, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.  Plaintiff was further injured when he paid a premium for the Contaminated Cat Food that have no or *de minimis* value based on the presence of the alleged Heavy Metals, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.  Damages can be calculated through expert testimony at trial.  Further, should Plaintiff encounter the Contaminated Cat Food in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Cat Food.

---

[1] Hereafter, "Heavy Metals" shall refer to arsenic, cadmium, lead, and mercury.

3

9. As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when he paid the purchase price or a price premium for the Contaminated Cat Food that did not deliver what was promised. He paid the premium price on the assumption that the labeling of the Contaminated Cat Food was accurate and that it was healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced. Plaintiff would not have paid this money had he known that the Contaminated Cat Food contained and/or had risk of inclusion of Heavy Metals, pentobarbital, toxins, BPA, non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements. Plaintiff was further injured because the Contaminated Cat Food have no or *de minimis* value based on the presence of the alleged Heavy Metals, pentobarbital, toxins, BPA, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements. Damages can be calculated through expert testimony at trial. Further, should Plaintiff encounter the Contaminated Cat Food in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Contaminated Cat Food.

10. Prior to purchase, Plaintiff saw and relied upon Defendants' packaging when making his decision to buy Defendants' Contaminated Cat Food.

11. Defendants' Contaminated Cat Food packaging and labeling included the following packaging claims, among others:

    (a)    "Delivering Nutrients Naturally";

    (b)    Biologically Appropriate™; and

    (c)    "Fresh Regional Ingredients."[2]

---

[2] Hereafter collectively referred to as "Misleading Packaging Claims."

12.    Plaintiff was deceived by Defendants' misleading packaging claims and omissions because Defendants' Contaminated Cat Food contained and/or had a material risk of containing non-conforming ingredients and contaminants, such as:

      (a)    Heavy Metals;

      (b)    a material amount of non-fresh ingredients;

      (c)    numerous and undisclosed non-regional ingredients;

      (d)    BPA; and/or

      (e)    pentobarbital.

13.    Plaintiff, like other reasonable consumers, reasonably relied on Defendants' Misleading Packaging Claims when deciding to pay premium prices for the Contaminated Cat Food.  Plaintiff and the consumers had no reason to know or believe that these claims were misleading and utilized by Defendants to increase sales of products that charged a substantial premium.

14.    In addition to the Misleading Packaging Claims, Defendants' packaging was also misleading because it failed to disclose the fact that Defendants' Contaminated Cat Food had a material risk and/or contained: Heavy Metals; a material amount of non-fresh ingredients; a material amount of non-regional ingredients; BPA; and/or pentobarbital.  Defendants intentionally omitted these contaminants and ingredients in order to induce and mislead reasonable consumers, such as Plaintiff, to purchase Defendants' Contaminated Cat Food at premium prices.

15.    As the result of Defendants' wrongful conduct, as alleged herein, Defendants injured Plaintiff when Plaintiff was misled to pay premium prices for Defendants' misleadingly packaged Contaminated Cat Food because the Contaminated Cat Food did not deliver what was promised.  Plaintiff would not have purchased the Contaminated Cat Food, or paid the premium

prices, if they had not been deceived by Defendants' Misleading Packaging Claims and misleading omissions.

16.     Plaintiff and the Class Members would not have purchased Defendants' Contaminated Cat Food at all, let alone at Defendants' premium prices, had Defendants not used these Misleading Packaging Claims or had Defendants properly disclosed the risk and inclusion of contaminants and ingredients that did not conform to the packaging.

17.     Plaintiff and the members of the proposed Class will continue to purchase the Contaminated Cat Food, and when they encounter Defendants' Contaminated Cat Food in the future, they will not be able to rely on the truthfulness of the packaging unless Defendants correct their Misleading Packaging Claims and misleading omissions.

### B.     Defendants

18.     Defendant Champion USA is incorporated in Delaware.  Its headquarters and principal place of business, as of March 2016, is located at 12871 Bowling Green Road, Auburn, Kentucky 42206.  Since that time, all Contaminated Cat Food sold in the United States is manufactured, sourced, and sold by Champion USA.

19.     Defendant Champion Canada is a Canadian limited partnership with its headquarters and principal place of business located at 11403-186 St NW, Edmonton, Alberta T5S 2W6.  Defendant Champion Canada wholly owns, operates, and/or controls Defendant Champion USA.   Prior to March 2016, all Contaminated Cat Food sold in the United States was manufactured, sourced, and sold by Champion Canada.

20.     Defendants formulate, develop, manufacture, label, distribute, market, advertise, and sell the Contaminated Cat Food throughout the United States, including in this District, during the Class Period (as defined herein).

21.     The packaging for the Contaminated Cat Food, relied upon by Plaintiff, was prepared, reviewed, and/or approved by Defendants and their agents, and was disseminated by

Defendants and their agents through the packaging and labeling of the Contaminated Cat Food that contained the misrepresentations alleged herein.

22.    Defendants intended for consumers, such as Plaintiff, to rely on the statements on the packaging and labeling when deciding to purchase the Contaminated Cat Food.  As a result of Defendants' misrepresentations, reasonable consumers, including the Plaintiff and the Class, were misled into purchasing the Contaminated Cat Food at premium prices.

23.    Defendants own, manufacture, and distribute the Contaminated Cat Food and ingredients.  Based on this, Defendants knew there were material omissions concerning the true quality and nature of the Contaminated Cat Food and/or authorized the unlawful, fraudulent, and deceptive use of their Misleading Packaging Claims and omissions.

24.    Defendants were responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including conducting sufficient Heavy Metal, BPA, and pentobarbital testing, for the Contaminated Cat Food and ingredients.

25.    Defendants knew or should have known that there were material omissions from the Contaminated Cat Food packaging and its ingredients.  Defendants also knew or should have known that the Contaminated Cat Food and its ingredients were deceptive because it did not conform to their Misleading Packaging Claims.

## **FACTUAL ALLEGATIONS**

### I.    **MISLEADING PACKAGING CLAIMS RESULTED IN PREMIUM PRICES AND INCREASED SALES**

26.    Defendants believed that some consumers perceive their cats as members of the family. Defendants referred to these consumers as "Pet Lovers" and targeted Pet Lovers as potential consumers for their cat food.

27.     Defendants believed that consumers, including Pet Lovers, would be willing to pay a price premium for cat food products that advertised, represented, and used fresh, locally or regionally sourced meat and fish ingredients.

28.     Before launching Orijen dog and cat food, Defendants developed packaging claims and labels that aligned with their belief that consumers were willing to pay a price premium for pet food that used fresh, locally or regionally sourced ingredients.  Defendants designed their new packaging claims to target and appeal to such consumers.

29.     Defendants' packaging claims for their Orijen brand included the representation that Orijen was a Biologically Appropriate™ cat food.  Biologically Appropriate™ was a marketing concept that Defendants intended to represent that Orijen diets contained large amounts of fresh meat and fish ingredients, which Defendants advertised were purchased from local or regional farmers, ranchers, and fisheries.

30.     After Orijen's launch, Defendants saw that they could sell their Orijen products, including the Contaminated Cat Food, at premium prices because they represented that it was premium cat food that used fresh, locally or regionally sourced ingredients.  Defendants eventually conformed Acana's packaging claims to be substantially similar to those advertised on Orijen.

31.     Defendants expanded their packaging claims and began representing that their Contaminated Cat Food was **B**iologically **A**ppropriate™ and was made from **F**resh **R**egional **I**ngredients.  Biologically Appropriate™ is a trademarked, objective advertising concept that Defendants intended to communicate to consumers that they designed their Contaminated Cat Food to mirror a cat's natural diet.

32.     Through their Biologically Appropriate™ packaging claim, Defendants promised and represented to consumers that the Contaminated Cat Food contained large amounts of natural and nutritious meat and fish ingredients.

8

33. Defendants' packaging claim of "Fresh Regional Ingredients" promised and represented to consumers that Defendants used a material amount of fresh ingredients, that they sourced locally or regionally, in the Contaminated Cat Food.

34. Defendants charged consumers premium prices for the Contaminated Cat Food based on Defendants' Misleading Packaging Claims and misleading omissions.

35. Defendants admitted that their BAFRINO packaging claims (their abbreviation for Biologically Appropriate™, Fresh, Regional and Never Outsourced) were the driving force that increased the sale of the Contaminated Cat Food and secured their status as a leader and innovator in the premium pet food market.

36. The official websites for Acana and Orijen display the Contaminated Cat Food, descriptions, and full list of ingredients for the Contaminated Cat Food and includes the following promises:

**AWARD-WINNING FOODS AND TREATS**

Biologically Appropriate™ ORIJEN represents a new class of food, designed to nourish dogs and cats according to their evolutionary adaptation to a diet rich and diverse in fresh meat and protein.

ORIJEN features unmatched inclusions of fresh free-run poultry, whole nest-laid eggs, whole wild-caught fish and ranch-raised meats – farmed or fished in our region by people we know and trust, and delivered to our kitchens daily so they're brimming with goodness.

Trusted by pet lovers everywhere, award-winning ORIJEN foods and treats are guaranteed to keep your cherished dogs and cats happy, healthy and strong!

**AWARD-WINNING BIOLOGICALLY APPROPRIATE™**

OUR MISSION IS CLEAR AND STRONG

We make Biologically Appropriate™ dog and cat foods from Fresh Regional Ingredients and we make them from start to finish in our very own award-winning kitchens.

Our mission represents a new standard in pet food, designed to nourish your dog and cat in two ways. First, according to its natural evolution to a meat and protein-rich diet. Second, using meats, poultry, eggs and fish that are sustainably ranched, farmed or fished by local suppliers and delivered to our kitchens fresh each day.

We think you'll love ACANA. More importantly, we think your dogs and cats will too.

9

37.     Photographs of the following Contaminated Cat Food packaging can be found in Exhibit 1:

(a)     Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food;

(b)     Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Cat Food;

(c)     Acana Regionals Meadowland with Poultry, Freshwater Fish, and Eggs Dry Cat Food;

(d)     Acana Regionals Pacifica with Herring, Pilchard, Flounder, Hake, and Rockfish Dry Cat Food;

(e)     Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry Cat Food;

(f)     Orijen Cat and Kitten Dry Cat Food;

(g)     Orijen Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food;

(h)     Orijen Six Fish New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Cat Food;

(i)     Orijen Tundra Boer Goat, Wild Boar, Venison, Arctic Char, Free-Run Duck, and Mutton; and

(j)     Orijen Fit and Trim Fresh Free-run Chicken and Turkey, Nest-Laid Eggs, and Wild-Caught Fish.

II.    **MISLEADING PACKAGING CLAIMS**

    A.    **"Delivering Ingredients Naturally"**

38.    The following images are some representative examples of Defendants' "Delivering Nutrients Naturally" Misleading Packaging Claim with regard to the Contaminated Cat Food:



    B.    **Biologically Appropriate™**

39.    The following images are some representative examples of Defendants' Biologically Appropriate™ Misleading Packaging Claim with regard to the Contaminated Cat Food respectively:

11



# AWARD-WINNING BIOLOGICALLY APPROPRIATE™

**OUR MISSION IS CLEAR AND STRONG**

We make Biologically Appropriate™ dog and cat foods from Fresh Regional Ingredients and we make them from start to finish in our very own award-winning kitchens.

Our mission represents a new standard in pet food, designed to nourish your dog and cat in two ways. First, according to its natural evolution to a meat and protein-rich diet. Second, using meats, poultry, eggs and fish that are sustainably ranched, farmed or fished by local suppliers and delivered to our kitchens fresh each day.

We think you'll love **ACANA**. More importantly, we think your dogs and cats will too.



C. **"Fresh Regional Ingredients"**

40. The following images are some examples of Defendants' "Fresh Regional Ingredients" Misleading Packaging Claim with regard to the Contaminated Cat Food respectively:





D. **Defendants' Omissions**

41. As discussed above, Defendants' packaging also misleadingly omitted the presence of Heavy Metals and the inclusion of a material amount of non-fresh ingredients, a material amount

of non-regional ingredients, BPA, toxins, pentobarbital, and any other chemicals in the Contaminated Cat Food. Defendants intentionally omitted these ingredients and contaminants in order to induce and mislead reasonable consumers to purchase Defendants' cat food at premium prices.

## III.   WHY PACKAGING CLAIMS AND OMISSIONS WERE MISLEADING

42.    Defendants' Misleading Packaging Claims of "Delivering Nutrients Naturally," "Biologically Appropriate™", and "Fresh Regional Ingredients," were misleading because they did not represent the true quality and content of the Contaminated Cat Food. In addition, while making the Misleading Packaging Claims, the Contaminated Cat Food packaging omitted the material information that the Contaminated Cat Food contained and/or had a material risk of containing non-conforming ingredients.

### A.    Heavy Metals

43.    At all times during the Class Period, Defendants knew or should have known that the Contaminated Cat Food contained Heavy Metals and was not sufficiently tested for Heavy Metals. During this time, Defendants omitted any reference to the presence of Heavy Metals or the testing for Heavy Metals from the Contaminated Cat Food packaging.

44.    Defendants knew that Heavy Metals were a contaminant that could potentially pose health risks to cats and humans. Defendants knew or should have known that the standards for heavy metal levels generally have become increasingly prohibitive in recent years.

45.    Defendants knew or should have known that they owed consumers a duty of care to prevent, or at the very least, minimize the presence of Heavy Metals in the Contaminated Cat Food to the extent reasonably possible.

46. Defendants knew or should have known that they owed consumers a duty disclose this risk of Heavy Metals in the Contaminated Cat Food consumers based on the decision to use the Misleading Packaging Claims.

47. Defendants also knew consumers, like Plaintiff, cared about the testing for Heavy Metals and potential inclusion of Heavy Metals in the Contaminated Cat Food.

48. Defendants knew that consumers purchased the Contaminated Cat Food based on the reasonable expectation that Defendants' manufactured the Contaminated Cat Food to the highest standards, which exceeded consumer expectations as to the Contaminated Cat Food. Based on this expectation, Defendants knew or should have known that consumers reasonably inferred that Defendants would hold the Contaminated Cat Food to the highest standards for preventing the inclusion of Heavy Metals and for testing for Heavy Metals.

49. Finally, Defendants knew or should have known that they could control the concentration levels of Heavy Metals in the Contaminated Cat Food by properly monitoring the ingredients' Heavy Metals and adjusting any formulation or diet to reduce Heavy Metals.

### 1. Presence of Heavy Metals

50. The Contaminated Cat Food contains arsenic, which is a carcinogen and toxin. Arsenic is a semi-metal element in the periodic table and does not degrade or disappear. It is odorless and tasteless. Arsenic occurs in the environment as an element of the earth's crust; it is found in rocks, soil, water, air, plants, and animals. Arsenic is combined with other elements such as oxygen, chlorine, and sulfur to form inorganic arsenic compounds. Historically, arsenic compounds were used in many industries, including: (i) as a preservative in pressure-treated lumber; (ii) as a preservative in animal hides; (iii) as an additive to lead and copper for hardening; (iv) in glass manufacturing; (v) in pesticides; (vi) in animal agriculture; and (vii) as arsine gas to enhance junctions in semiconductors. The United States has canceled the approvals of some of

these uses, such as arsenic-based pesticides, for health and safety reasons. Some of these cancellations were based on voluntary withdrawals by producers. For example, manufacturers of arsenic-based wood preservatives voluntarily withdrew their products in 2003 due to safety concerns, and the U.S. Environmental Protection Agency ("EPA") signed the cancellation order. In the Notice of Cancellation Order, the EPA stated that it "believes that reducing the potential residential exposure to a known human carcinogen is desirable."

51.     Inorganic arsenic is highly toxic and a known cause of human cancers. The association between inorganic arsenic and cancer is well documented. As early as 1879, high rates of lung cancer in miners from the Kingdom of Saxony were attributed, in part, to inhaled arsenic. By 1992, the combination of evidence from Taiwan and elsewhere was sufficient to conclude that ingested inorganic arsenic, such as is found in contaminated drinking water and food, was likely to increase the incidence of several internal cancers. The scientific link to skin and lung cancers is particularly strong and longstanding, and evidence supports conclusions that arsenic may cause liver, bladder, kidney, and colon cancers as well.

52.     Based on the risks associated with exposure to higher levels of arsenic, both the EPA and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA).[3]

53.     The Contaminated Cat Food also contain lead, which is another carcinogen and developmental toxin known to cause health problems. Lead is a metallic substance formerly used as a pesticide in fruit orchards, but the use of such pesticides is now prohibited in the United States.

---

[3] The FDA has taken action based on consumer products exceeding this limit, including testing and sending warning letters to the manufacturers. *See*, *e.g.*, Warning Letter from FDA to Valley Processing, Inc. (June 2, 2016), https://www.fda.gov/iceci/enforcementactions/warningletters/2016/ucm506526.htm.

54.     Lead poisoning can occur from ingestion of food or water containing lead.  Lead, unlike many other poisons, builds up in the body over time as the person is exposed to and ingests it, resulting in a cumulative exposure which can, over time, become toxic and seriously injurious to health.  Chronic or acute exposure to lead can lead to the development of chronic poisoning, cancer, developmental and reproductive disorders, severe brain and kidney damage, and untimely death.

55.     The FDA has set standards that regulate the maximum ppb of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic.  *See* 21 C.F.R. §165.110(b)(4)(iii)(A) (2016).

56.     The Contaminated Cat Food also contains mercury, a known toxin which can damage the cardiovascular system, nervous system, kidneys, and digestive tract in cats.  The impact of the various ways humans and animals are exposed to and ingest mercury has been studied for years.  In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals.[4]

57.     Continued exposure to mercury can injure the inner surfaces of the digestive tract and abdominal cavity, causing lesions and inflammation.  Mercury has also caused lesions in the central nervous system (spinal cord and brain), kidneys, and renal glands.[5]

58.     Based on the toxicity and risks of mercury, regulations have been enacted at both the Federal and state level.

59.     Finally, the Contaminated Cat Food contains cadmium which has been observed to cause anemia, liver disease, and nerve and brain damage in animals eating or drinking it.[6]  The

---

[4] https://www3.epa.gov/airtoxics/112nmerc/volume5.pdf

[5] https://wagwalking.com/condition/mercury-poisoning

[6] https://www.atsdr.cdc.gov/ToxProfiles/tp5-c1-b.pdf

U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens, and the EPA has likewise determined that cadmium is a probable human carcinogen.[7]  It has been specifically noted that "[k]idney and bone effects have … been observed in laboratory animals ingesting cadmium."[8]

60.     Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[9]

61.     Despite the known risks of exposure to these heavy metals, Defendants have negligently, recklessly, and knowingly sold the Contaminated Cat Food without disclosing they contain and/or have a high risk of inclusion of arsenic, mercury, cadmium, and lead to consumers like Plaintiff.  Indeed, Defendants have publicly acknowledged that consumers "have deep feelings and a sense of responsibility for the well-being of their dogs and cats."[10]

62.     Defendants' Misleading Packaging Claim of Biologically Appropriate™ was also misleading because Heavy Metals are a biologically inappropriate contaminant.

63.     Defendants knew that excluding Heavy Metals from the Contaminated Cat Food was desirable.  Defendants knew or should have known that their "Fresh Regional Ingredients" Misleading Packaging Claim was intended to convey to consumers that Defendants prevented the inclusion of Heavy Metals.  Defendants even aspired to the goal of having "no … heavy metals"

---

[7] https://www.atsdr.cdc.gov/phs/phs.asp?id=46&tid=15

[8] https://www.atsdr.cdc.gov/ToxProfiles/tp5-c1-b.pdf

[9]  https://www.fda.gov/Food/FoodborneIllnessContaminants/Metals/default.htm (last accessed June 16, 2020).

[10] https://www.theglobeandmail.com/amp/report-on-business/small-business/canadian-powerhouse-export-your-dog-is-eating-it/article37605774/

in the Contaminated Cat Food specifically as a "key differentiator" for their "Fresh Regional Ingredients" Misleading Packaging Claim. Furthermore, Defendants' own employees believed that the Contaminated Cat Food did not contain any Heavy Metals. If Defendants aspired and believed that the Contaminated Cat Food contained no Heavy Metals, it was reasonable for consumers as well.

64.     Additionally, Defendants knew or should have been aware that a consumer would be feeding the Contaminated Cat Food multiple times each day to his or her cat, making it the main, if not only, source of food for the cat and leading to repeated exposure of the Heavy Metals.

### 2.     Inadequate Testing of Heavy Metals

65.     During the Class Period, Defendants knew or should have known that they failed to adequately test for Heavy Metals in the Contaminated Cat Food and ingredients. Defendants were on notice that their pet loving consumers were concerned about whether Defendants sufficiently tested for the presence of Heavy Metals and that consumers reasonably expected Defendants to adequately test for Heavy Metals in a way that would exceed the highest standards for premium priced dog foods.

66.     Defendants knew that failing to test for Heavy Metals would be negligent on their part. Defendants' internal policies called for regular Heavy Metal with regard to the Contaminated Cat Food and its ingredients. Defendants failed to take these Heavy Metal testing policies seriously and failed to follow their internally established Heavy Metal testing schedule.

67.     Defendants knew that they were running blind with regard to the presence of Heavy Metals in the Contaminated Cat Food due to Defendants' failure to sufficiently test for Heavy Metals.

68.     Defendants' Misleading Packaging Claims of Biologically Appropriate™ and "Fresh Regional Ingredients" were misleading based on Defendants' failure to adequately test for

Heavy Metals, which resulted in the Contaminated Cat Food containing and/or having a material risk of containing Heavy Metals that were insufficiently monitored.

69.     Despite Defendants' knowledge that the Contaminated Cat Food was not adequately tested for Heavy Metals, Defendants negligently, and/or knowingly sold the Contaminated Cat Food without disclosing that the Contaminated Cat Food was not adequately tested for Heavy Metals. Defendants' omission as to the inadequate heavy metal testing on the Contaminated Cat Food packaging was misleading and intended to induce consumers to purchase the Contaminated Cat Food at premium prices when consumers otherwise would not have.

### B.     Non-Fresh Ingredients

70.     At all times during the Class Period, Defendants knew or should have known that the Contaminated Cat Food contained a material amount of non-fresh ingredients, such as regrind ingredients, expired ingredients, frozen ingredients, and refreshed ingredients.

71.     Defendants knew or should have known that their packaging claims were misleading to consumers due to Defendants' use of "regrinds."

72.     Defendants made regrind ingredients from already cooked dog and cat food that had failed nutritional testing, water activity testing, product temperature testing, and/or microbiological testing. Defendants also made regrinds from finished dog and cat food that was too old to sell.

73.     By using regrinds in their manufacturing process, Defendants used ingredients that they cooked twice—first in the production that resulted in out-of-specification cat food and second as a reused ingredient.

74.     Defendants' use of regrind ingredients was a widespread business practice that occurred throughout the Class Period and for all of the Contaminated Cat Food. Defendants routinely used regrinds as a major ingredient in the Contaminated Cat Food. Defendants did not

disclose the use of regrinds anywhere on the Contaminated Cat Food packaging, including the ingredient panel.

75.     Defendants had flowcharts that tracked the various dog and cat food diets regrinds that they used as an ingredient in each cat food diet.  Defendants used dog food as a regrind ingredient in the Contaminated Cat Food.

76.     Defendants even used regrinds that were nutritionally deficient, nutritionally dangerous, and contaminated with salmonella.

77.     Defendants used millions of pounds of regrinds each year during the Class Period.  For example, Defendants' DogStar kitchen used over 3.1 million pounds of regrinds from 2016 to 2018.  In fact, Defendants' nickname for their regrind inventory was "Regrind Mountain."

78.     Defendants manufactured the Contaminated Cat Food with high inclusion rates of regrinds.  For example, some production lots of Orijen contained up to 11.49% regrinds, while Acana production lots contained up to 6.7% regrinds.

79.     Defendants did not disclose their use of regrinds as an ingredient on the Contaminated Cat Food ingredient panels or anywhere on the Contaminated Cat Food packaging.

80.     As a double cooked ingredient, Defendants knew that regrinds were not fresh.  In addition, Defendants were aware that reprocessing and recooking regrinds caused the Contaminated Cat Food to lose nutritional value and taste.

81.     Defendants knew or should have known that their use of regrinds contradicted their packaging claims.  For instance, Defendants took active steps to try to hide their use of regrinds during consumer, retailer, and distributor visits to their kitchens.

82.     Consistent with Defendants' use of non-fresh regrind ingredients, Defendants also used expired and refreshed ingredients in the Contaminated Cat Food.  Defendants' monitoring

and evaluation of ingredients was insufficient to prevent the use of non-fresh, expired ingredients in the Contaminated Cat Food.

83.     Furthermore, Defendants returned ingredients that they did not need to their ingredient suppliers, who then froze these ingredients. When Defendants requested these ingredients, their suppliers would then thaw and send these "refreshed" ingredients back to Defendants.  Expired and refreshed ingredients were not fresh and Defendants knew that.

84.     Defendants also knew that frozen ingredients were frequently used in manufacturing of its products, including in the Contaminated Cat Food.  Defendants were also aware that a reasonable consumer would not understand that the "raw" ingredients described in their packaging referred to "frozen" ingredients. Defendants misleading omitted any definition that explained that "raw" ingredients meant that the ingredients were frozen or previously frozen.

85.     Despite Defendants' knowledge that the Contaminated Cat Food contained a material amount of non-fresh ingredients, Defendants negligently, and/or knowingly sold the Contaminated Cat Food while misleadingly omitting that the Contaminated Cat Food contained the non-fresh ingredients as alleged herein.  Defendants' misleading omission as to the presence of the non-fresh ingredients, as alleged herein, from the Contaminated Cat Food packaging was intended to induce and deceive consumers to purchase the Contaminated Cat Food at premium prices.

86.     Defendants knew or should have known that their use of regrind ingredients failed to substantiate their Misleading Packaging Claims.  Regrind ingredients are not fresh because regrinds are dried, twice-cooked ingredients. Regrind ingredients are also not Biologically Appropriate™ because regrinds are nutritionally deficient compared to fresh, Biologically Appropriate™ ingredients.

87.     Defendants' Biologically Appropriate™ packaging claim was misleading because expired ingredients are nutritionally deficient.

88.     Defendants' "Fresh Regional Ingredients" packaging claim was misleading based on inclusion (or risk thereof based on Defendants' common practices) of regrind, frozen, expired, and refreshed ingredients in the Contaminated Cat Food.  None of these ingredients are fresh.

### C.      Non-Regional Ingredients

89.     At all times during the Class Period, Defendants knew or should have known that their misleading packaging claims were misleading because Defendants sourced many ingredients from non-local and non-regional ingredient suppliers, including international ingredient suppliers.

90.     Defendants' Misleading Packaging Claims for the Contaminated Cat Food emphasized and represented that Defendants focused on the use of fresh, regional ingredients that were local to their kitchens from trusted suppliers.

91.     During the Class Period, Defendants manufactured the Contaminated Cat Food using imported, non-regional ingredients from international and non-regional ingredient suppliers.

92.     Defendants purchased and used the following foreign ingredients and imported the following foreign ingredients and imported the following non-regional ingredients for the Contaminated Cat Food: spray dried sardines from Peru, spray dried mackerels from Morocco, herring oil and herring meal from Denmark, salmon oil from Chile, duck meal and pork meal from the European Union, palatants and vitamins from China, turmeric from India, and large amounts of lamb, cattle, goat, and mutton ingredients from New Zealand and Australia.

93.     Defendants knew or should have known that sourcing ingredients from high-risk locations, such as China and India, did not align with Defendants' "Fresh and Regional Ingredients" Misleading Packaging Claim.  Defendants nonetheless purchased palatants and vitamins from China and turmeric from India.

94. Despite Defendants' knowledge that the Contaminated Cat Food contained a material amount of non-regional ingredients, Defendants negligently, and/or knowingly sold the Contaminated Cat Food while misleadingly omitting that the Contaminated Cat Food contained numerous ingredients from non-regional suppliers. Defendants' misleading omission as to the presence of non-regional ingredients on the Contaminated Cat Food packaging was intended to induce and deceive consumers to purchase the Contaminated Cat Food at premium prices.

95. Defendants' "Fresh Regional Ingredients" packaging claim was misleading, in part, because Defendants regularly used non-regional ingredients that are internationally sourced.

96. Defendants' use of undisclosed imported meat ingredients was also deceiving to consumers because these imported ingredients were frozen, and thus, was misleading in that it was not consistent with Defendants' "Fresh Regional Ingredients" packaging claim.

**D. BPA**

97. Defendants knew or should have known that the Contaminated Cat Food contained and/or had a material risk of containing BPA. Defendants also knew or should have known that the Contaminated Cat Food should have been tested for BPA to conform to the Misleading Packaging Claims.

98. Defendants knew or should have known that consumers paid Defendants premium prices for the Contaminated Cat Food because consumers expected that Defendants would exceed food standards regarding the exclusion of unnatural and non-nutritious contaminants, such as BPA.

99. Defendants knew or should have known that consumers expected Defendants to have sufficient BPA testing for the Contaminated Cat Food and to provide the appropriate disclosures regarding the presence of BPA.

100.    Defendants did not monitor or test for BPA in the Contaminated Cat Food. Defendants did not schedule any BPA testing on the Contaminated Cat Food or any of the ingredients and packaging used in the Contaminated Cat Food.

101.    Through their Misleading Packaging Claims, Defendants conveyed to consumers that the Contaminated Cat Food, and the ingredients used to make the Contaminated Cat Food, were natural and nutritious, and thus, would not contain and/or have a material risk of containing unnatural, non-nutritious contaminants like BPA.

102.    Defendants' Biologically Appropriate™ packaging claim was misleading. The Contaminated Cat Food was not Biologically Appropriate™ because it contained and/or had a material risk of containing BPA, an unnatural, non-nutritious contaminant.

103.    Defendants' "Fresh Regional Ingredients" packaging claim was misleading. Defendants' use of non-fresh, rendered ingredients exposed the Contaminated Cat Food to containing and/or the material risk of containing BPA.  Furthermore, "Fresh Regional Ingredients" was misleading because fresh ingredients, among other reasons alleged herein, do not contain BPA, an unnatural, non-nutritious contaminant.

104.    Defendants' Misleading Packaging Claims were also deceptive due to Defendants' misrepresentations that the Contaminated Cat Food "Deliver[s] Nutrients Naturally."  Reasonable consumers would not expect that the Contaminated Cat Food contained and/or had a material risk of containing BPA, which was a non-nutritious and unnatural contaminant that did not deliver nutrients naturally.

105.    Defendants also misleadingly omitted from their packaging that the Contaminated Cat Food contained and/or had a material risk of containing BPA.  Defendants also misleadingly omitted from the Contaminated Cat Food packaging that Defendants did not test the Contaminated Cat Food or the ingredients used in the Contaminated Cat Food for BPA.

25

### E. Pentobarbital—Red Meat Diets

106.     Defendants knew or should have known that their packaging claims for their Red Meat diets were misleading to consumers because Defendants failed to monitor and test their ingredients and Contaminated Cat Food for the presence of pentobarbital and/or the material risk of containing pentobarbital.[11]

#### 1. Pentobarbital Was a Well-Known Risk

107.     Pentobarbital is a Class II controlled substance.  There is no safe or set level for pentobarbital in cat food.  If pentobarbital is present in cat food, the cat food is adulterated.

108.     The ingestion of pentobarbital by a cat can lead to adverse health issues, including: tyalism (salivation); emesis (vomiting); stool changes (soft to liquid stools, blood, mucus, urgency, explosive nature, etc.); hyporexia (decreased appetite); lethargy/depression; neurologic abnormalities (tremor, seizure, vocalization, unusual eye movements); ataxia (difficulty walking); collapse; coma; and death.

109.     According to the FDA, cat food manufacturers, such as Defendants, were responsible for taking appropriate and responsible steps to ensure that their Contaminated Cat Food and ingredients did not contain pentobarbital, such as verifying the safety and source of their ingredients and raw materials.

110.     Defendants knew or should have known that rendered ingredients, including beef tallow, had a material risk of containing pentobarbital.

111.     Beef tallow is a rendered ingredient that is not fresh, but rather a liquid ingredient that should be derived from the fat of healthy, slaughtered cows.

---

[11] "Red Meat" diets refers to Acana Appalachian Ranch, Acana Heritage Red Meats, and Orijen Regional Red.

112. Defendants purchased their beef tallow from third party suppliers. For example, Defendants purchased hundreds of thousands of pounds of beef tallow from a large rendered ingredient supplier ("Tallow Supplier") from August 2016 to May 2018.

113. Defendants considered beef tallow to be a high-risk ingredient. Defendants' internal policies generally required annual audits for high-risk ingredient suppliers.

114. Defendants were on notice as to the material risk of pentobarbital because they knew that other pet food companies experienced problems and recalls associated with the use of ingredients that were adulterated with pentobarbital.

### 2. Failure to Monitor

115. Defendants' used ***beef tallow (fat)*** in their Red Meat diets. The following is an example of Defendants' ingredient panel for Orijen Regional Red:

INGREDIENTS

Deboned beef, deboned wild boar, deboned goat , deboned lamb, lamb liver, beef liver, beef tripe, wild boar liver, deboned mutton, beef heart, whole atlantic mackerel, deboned pork, goat meal, wild boar meal, lamb meal, mackerel meal, whole green peas, whole red lentils, whole pinto beans, beef kidney, pork liver, beef meal, mutton meal, beef fat, herring meal, whole yellow peas, whole chickpeas, pork heart, pork kidney, natural pork flavor, whole green lentils, whole navy beans, herring oil, lamb tripe, lentil fiber, whole pumpkin, whole butternut squash, kale, spinach, mustard greens, collard greens, turnip greens, whole carrots, whole apples, whole pears, dried kelp, freeze-dried beef liver, freeze-dried beef tripe, freeze-dried lamb liver, freeze-dried lamb tripe, pumpkin seeds, sunflower seeds, zinc proteinate, mixed tocopherols (preservative), chicory root, turmeric, sarsaparilla root, althea root, rosehips, juniper berries, dried lactobacillus acidophilus fermentation product, dried bifidobacterium animalis fermentation product, dried lactobacillus casei fermentation product.

116. Defendants failed to properly monitor and audit Tallow Supplier regarding the material risk of pentobarbital adulteration in their beef tallow.

117.    Since 2016, Tallow Supplier handled condemned carcasses. Tallow Supplier had a standard operating procedure that outlined its protocol to segregate condemned carcasses from the raw materials that were used to create Defendants' beef tallow.

118.    Defendants never verified that Tallow Supplier's standard operating procedure effectively segregated condemned carcasses and/or other undesirable raw materials, such as pentobarbital, from Defendants' beef tallow.

119.    Defendants never tested the beef tallow they used from Tallow Supplier to confirm that pentobarbital and/or euthanized animal carcasses were excluded.

120.    Defendants knew or should have known that Tallow Supplier's practice of handling raw materials from condemned animal carcasses that were not fit for slaughter increased the likelihood that Tallow Supplier's beef tallow contained undesirable raw materials, including pentobarbital.

121.    Defendants did not follow their policy of annually auditing high-risk ingredient suppliers. Defendants did not conduct any audits for Tallow Supplier in 2016 or 2017, even though Defendants considered Tallow Supplier to be a high-risk ingredient supplier.

122.    Despite the news of recent pentobarbital recalls, Defendants did not require any additional quality control safeguards to confirm, test, or verify that Tallow Supplier was effectively preventing Defendants' beef tallow from becoming adulterated with pentobarbital. As mentioned above, Defendants instead ignored internal requests to do so.

123.    When Defendants finally audited Tallow Supplier in early 2018, Defendants observed that other raw materials and products were spilled and built up on the floors and equipment. Defendants' observations indicated that Tallow Supplier's segregation protocol was ineffective.

124.     Defendants did not request any corrective action from a Tallow Supplier. Defendants acknowledged that follow-up corrective actions after Quality Assurance audits was one of their weaknesses.

### 3.     Material Risk of Pentobarbital Ignored for Years

125.     Defendants knew or should have known that Tallow Supplier's manufacturing process and quality assurance practices failed to effectively screen and prevent their beef tallow and Contaminated Cat Food from containing pentobarbital.

126.     Tallow Supplier conducted additional testing on their own and found that their beef tallow tested positive for pentobarbital in November 2017, January 2018, and February 2018. During this same time period, Defendants purchased approximately 282,000 pounds of beef tallow from Tallow Supplier.

127.     Defendants have not taken any steps to test, verify, or confirm that earlier shipments of beef tallow from Tallow Supplier did not contain any pentobarbital.

128.     Defendants have also not tested any of the Contaminated Cat Food they manufactured from November 2017 to February 2018 that used Tallow Supplier's beef tallow as an ingredient to determine to whether the Contaminated Cat Food contained pentobarbital.

129.     Defendants have never disclosed that the Contaminated Cat Food that used Tallow Supplier's beef tallow was at risk of pentobarbital contamination for years.

### 4.     Failure to Disclose or Recall Adulterated Red Meat Diets

130.     On May 7, 2018, government agencies notified Defendants that beef tallow shipped by Tallow Supplier to Defendants' DogStar kitchen had tested positive for pentobarbital.

131.     By this point, Defendants had already produced over 1.7 million pounds of finished kibble that used pentobarbital adulterated tallow as an ingredient.

132.    Defendants also used over 10,000 pounds of regrinds that contained pentobarbital as an ingredient in the Contaminated Cat Food.

133.    Defendants estimated that the Red Meat diets that used the adulterated beef tallow as an ingredient contained pentobarbital at levels of up to 3.4 ppb.

134.    Defendants knew or should have known that the FDA did not tolerate any amount of pentobarbital in cat food.  The FDA has zero tolerance for any pentobarbital in cat food.

135.    Despite estimating that pentobarbital was present in their Red Meat diets, Defendants did not recall any of the affected Red Meat diets that were already in retail markets.

136.    While Defendants retrieved much of their Contaminated Cat Food, Defendants allowed over 100,000 pounds to remain in retail stores despite knowing that it contained some level of pentobarbital.  Defendants also sold cat food that used over 10,000 pounds of pentobarbital-contaminated regrinds as an ingredient.

137.    Defendants never disclosed to consumers that they purchased Red Meat diets in retail stores that contained some level of pentobarbital or containing pentobarbital contaminated regrinds.

138.    Defendants refused to offer any refund to consumers who purchased the Red Meat diets that contained pentobarbital.

139.    In November 2018, Defendants filed a lawsuit against Tallow Supplier for damages from the pentobarbital incident in 2018.

140.    Defendants sued Tallow Supplier for contaminating their finished kibble to pentobarbital.  Defendants argued that Tallow Supplier was liable because they failed to immediately disclose to Defendants that their beef tallow contained pentobarbital.

141.    Defendants knew or should have known that they should have disclosed the presence of and/or material risk of containing pentobarbital in their beef tallow.  At the same time,

Defendants also assert that they did not need to disclose the presence of pentobarbital in the Contaminated Cat Food to consumers.

### 5.    Undisclosed Pentobarbital Risk Was Misleading

142.    Despite Defendants' knowledge that the Contaminated Cat Food contained and/or had a material risk of containing pentobarbital, Defendants negligently, and/or knowingly sold the Contaminated Cat Food while misleadingly omitting that the Contaminated Cat Food contained and/or had a material risk of containing or being adulterated by pentobarbital.  Defendants' misleading omission as to the presence and/or risk of containing or being adulterated by pentobarbital on the Contaminated Cat Food packaging was intended to induce and deceive consumers to purchase the Contaminated Cat Food at premium prices.

143.    Defendants' Biologically Appropriate™ and "Fresh Regional Ingredients" packaging claims were also misleading based on the presence and/or risk of pentobarbital. Pentobarbital is a dangerous, unnatural poison that is not Biologically Appropriate™.  Defendants' Contaminated Cat Food was contaminated with pentobarbital only because Defendants used beef tallow, a non-fresh ingredient that did not conform to their "Fresh Regional Ingredient" representations.

144.    Defendants' Misleading Packaging Claims were also deceptive due to Defendants' misrepresentations that the Contaminated Cat Food would "Deliver[] Nutrients Naturally." Reasonable consumers would not expect that the Contaminated Cat Food contained and/or had a material risk of containing pentobarbital, which was a non-nutritious and unnatural contaminant that did not deliver nutrients naturally.

## IV.  MISLEADING PACKAGING CLAIMS AND OMISSIONS MISLED AND DECEIVED CUSTOMERS

145.  Defendants' Misleading Packaging Claims and omissions were misleading to consumers because the Contaminated Cat Food contained and/or had a material risk of containing a material amount of non-conforming ingredients and contaminants.

146.  The following generally summarizes the Misleading Packaging Claims and omissions that Defendants negligently or intentionally used to mislead and deceive reasonable consumers:

| **Packaging Claims** | **Acana** | **Orijen** |
|---|---|---|
| *"Deliver[] Nutrients Naturally"* | ✓ | |
| *Biologically Appropriate*[TM] | ✓ | ✓ |
| *"Fresh Regional Ingredients"* | ✓ | ✓ |

147.  Reasonable consumers, like Plaintiff, paid Defendants' premium prices for the Contaminated Cat Food because the consumers reasonably relied on the accuracy of Defendants' Misleading Packaging Claims and omissions.

148.  Reasonable consumers, like Plaintiff and other Class Members, considered the above Misleading Packaging Claims and omissions to be material to their decision to purchase Defendants' Contaminated Cat Food.

149.  Defendants knew or should have known that the Contaminated Cat Food contained and/or had a material risk of containing ingredients and contaminants that were non-conforming to these packaging claims.  Defendants also intentionally omitted any reference to the inclusion and/or material risk of containing Heavy Metals; regrind ingredients; BPA; and/or pentobarbital on the Contaminated Cat Food packaging.

32

150. Defendants knew or should have known that consumers would consider these non-conformances with their packaging claims to be a material consideration when purchasing Defendants' Contaminated Cat Food.

151. A reasonable consumer would not have paid Defendants' premium prices had they known that the Contaminated Cat Food contained and/or had a material risk of containing the non-conforming ingredients and contaminants alleged herein.

152. Furthermore, many reasonable consumers would have refused to purchase the Contaminated Cat Food entirely if they had known that the Contaminated Cat Food contained and/or had a material risk of containing a material amount of the non-conforming ingredients and contaminants, as alleged herein.

153. As a result of these false or Misleading Packaging Claims and misleading omissions, consumers, like Plaintiff, suffered substantial financial losses by overpaying premium prices for the Contaminated Cat Food that did not conform to their Misleading Packaging Claims, as alleged herein.

## V. DEFENDANTS' MISLEADING PACKAGING CLAIMS AND RELATED OMISSIONS VIOLATED ILLINOIS LAWS

154. Illinois laws were designed to ensure that a company's packaging claims and representations about its products were truthful and accurate.

155. Defendants violated Illinois laws by negligently, recklessly, and/or intentionally misrepresenting that the Contaminated Cat Food conformed to the following packaging claims:

(a)    "Delivering Nutrients Naturally";

(b)    Biologically Appropriate™; and

(c)    "Fresh Regional Ingredients."

156.    Defendants also owed consumers a legal duty to disclose that the Contaminated Cat Food contained and/or had a material risk of containing pentobarbital, regrinds, refreshed ingredients, expired ingredients, regrinds that contained pentobarbital, a material amount of non-regional ingredients, insufficient heavy metal testing, and/or other ingredients and contaminants that did not conform to Defendants' Misleading Packaging Claims.

157.    Defendants' marketing and advertising campaign on its packaging was sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiff to plead reliance upon each advertised misrepresentation.

158.    Defendants' deceptive packaging practices implicated the public as consumers because Defendants directed their misrepresentations at the market generally.

159.    Defendants engaged in this long-term advertising campaign to convince potential customers that they should pay Defendants a price premium for the Contaminated Cat Food because consumers expected that Defendants used ingredients that conformed to all of their packaging claims and effectively prevented the inclusion of non-nutritious and unnatural contaminants and ingredients through regular monitoring, testing, and screening.

## VI.    CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE

160.    Plaintiff reasonably relied upon the Misleading Packaging Claims alleged herein when he made his decision to purchase the Contaminated Cat Food.

161.    Any reasonable consumer would consider the packaging and labeling of a cat food product (as well as the other false and/or misleading representations alleged herein) when deciding whether to purchase said cat food.

162.    Consumers reasonably relied upon Defendants' Misleading Packaging Claims as objective statements that communicated, represented, and advertised that the Contaminated Cat Food had specific product characteristics.

34

163. Plaintiff, along with other reasonable consumers, reasonably interpreted and relied upon Defendants' Misleading Packaging Claim of Biologically Appropriate™ to mean that the Contaminated Cat Food did not contain biologically inappropriate, unnatural, or non-nutritious ingredients and contaminants.

164. Plaintiffs' reliance and interpretation that the Contaminated Cat Food did not contain a material amount of non-fresh and non-regional ingredients based on Defendants' marketing of "Fresh Regional Ingredients," was also reasonable because Defendants packaging repeatedly advertised and emphasized this marketing claim.

165. Plaintiffs' reliance and interpretation that the Contaminated Cat Food contained a material amount of "Fresh Regional Ingredients" was also reasonable because Defendants' packaging repeatedly advertised and emphasized this marketing claim.

166. As discussed above, Defendants foresaw Plaintiffs' reliance on their Misleading Packaging Claims. Defendants designed their packaging claims to target and induce reasonable consumers, like Plaintiff, to pay premium prices for the Contaminated Cat Food based on Defendants' Misleading Packaging Claims.

## VII.   DEFENDANTS' KNOWLEDGE OF THE MISREPRESENTATIONS AND THEIR MATERIALITY

167. Defendants had exclusive knowledge of the physical and chemical makeup and formula of the Contaminated Cat Food and ingredients, including whether any of the Contaminated Cat Food contained and/or had a risk of containing a material amount of non-conforming ingredients and contaminants.

168. Defendants also had exclusive knowledge of their suppliers, including where the ingredients were sourced, how the ingredients arrived, whether the ingredients were frozen, the

quality of received ingredients, and whether any of the supplied ingredients contained and/or had a material risk of containing Heavy Metals, salmonella, and/or pentobarbital.

169.    Furthermore, Defendants had exclusive knowledge as to the details of the Contaminated Cat Food formulas and ingredient supply chains and the common practices of using undisclosed non-fresh and non-regional ingredients.

170.    Defendants also had exclusive knowledge as to their use of millions of pounds of regrinds as an ingredient in the Contaminated Cat Food.

## VIII.   DEFENDANTS ACTED NEGLIGENTLY AND/OR INTENTIONALLY TO MISLEAD CONSUMERS

171.    Defendants acted intentionally to hide the true quality and composition of the Contaminated Cat Food.  Defendants willingly misrepresented and failed to disclose to consumers that these diets contained and/or had a material risk of containing Heavy Metals and BPA; numerous undisclosed non-fresh ingredients and non-regional ingredients, including regrinds; and/or being manufactured with ingredients that contain pentobarbital.

172.    Defendants did so despite knowing that the presence and/or material risk of the presence of these risks and non-conforming ingredients in the Contaminated Cat Food was material to a reasonable consumer.  Defendants knew that consumers trusted and relied on Defendants to ensure that the Contaminated Cat Food did not contain any ingredients and contaminants that did not conform to Misleading Packaging Claims.

## CLASS ACTION ALLEGATIONS

173.    Plaintiff brings this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

*Class #1 ("Main Class")*: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased the Contaminated Cat Food products[12] in the State of Illinois for household or business use, and not resale.

*Subclass #1 ("Orijen Class")*: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased Orijen Contaminated Cat Food products[13] in the State of Illinois for household or business use, and not resale.

*Subclass #2 ("Acana Regionals Class")*: All persons who reside in the State of Illinois who, from July 1, 2014 to the present, purchased Acana Regionals Contaminated Cat Food products[14] in the State of Illinois for household or business use, and not resale.

---

[12] Specifically, the Main Class represents consumers that purchased: (a) Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food; (b) Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Cat Food; (c) Acana Regionals Meadowland with Poultry, Freshwater Fish, and Eggs Dry Cat Food; (d) Acana Regionals Pacifica with Herring, Pilchard, Flounder, Hake, and Rockfish Dry Cat Food; (e) Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry Cat Food; (f) Orijen Cat and Kitten Dry Cat Food; (g) Orijen Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food; (h) Orijen Six Fish New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Cat Food; (i) Orijen Tundra Boer Goat, Wild Boar, Venison, Arctic Char, Free-Run Duck, and Mutton; and (j) Orijen Fit and Trim Fresh Free-run Chicken and Turkey, Nest-Laid Eggs, and Wild-Caught Fish.

[13] Specifically, the Orijen Class represents consumers that purchased: (a) Orijen Cat and Kitten Dry Cat Food; (b) Orijen Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food; (c) Orijen Six Fish New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Cat Food; (d) Orijen Tundra Boer Goat, Wild Boar, Venison, Arctic Char, Free-Run Duck, and Mutton; and (e) Orijen Fit and Trim Fresh Free-run Chicken and Turkey, Nest-Laid Eggs, and Wild-Caught Fish.

[14] Specifically, the Acana Regionals Class represents consumers that purchased: (a) Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food; (b) Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Cat Food; (c) Acana Regionals Meadowland with Poultry, Freshwater Fish, and Eggs Dry Cat Food; (d) Acana Regionals Pacifica with Herring, Pilchard, Flounder, Hake, and Rockfish Dry Cat Food; and (e) Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry Cat Food.

*Subclass #3 ("Red Meat Class")*: All persons who reside in the State of Illinois who, from August 2016 to the present, purchased a "Red Meat" diet[15] that used beef tallow in the State of Illinois for household or business use, and not resale.

174.    Excluded from the Class are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

175.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

176.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to the parties and Court.

177.    Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

(a)    whether Defendants owed a duty of care to Plaintiff and the Class;

(b)    whether Defendants knew or should have known that the Contaminated Cat Food contained and/or had a material risk of containing Heavy Metals, toxins, BPA; a material amount of non-fresh ingredients, a material amount of non-regional ingredients, including regrinds, pentobarbital; and/or any other ingredients or contaminants that did not conform to the packaging claims;

---

[15] The Red Meat Class represents consumers that purchased: (a) Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food; (b) Orijen Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food; and (c) Acana Heritage Red Meats.

(c)      whether Defendants failed to test the Contaminated Cat Food and ingredients for the presence of Heavy Metals, pentobarbital, toxins, BPA, and/or unnatural or other contaminants that did not conform to the packaging claims;

(d)      whether Defendants wrongfully represented that the Contaminated Cat Food conformed to the following packaging claims: "Delivering Nutrients Naturally"; Biologically Appropriate™; and "Fresh Regional Ingredients."

(e)      whether Defendants wrongfully represented and continue to represent that Defendants hold the Contaminated Cat Food to higher, if not the highest standards, and exceed all consumer expectations and government requirements;

(f)      whether Defendants wrongfully represented and continue to represent that Defendants tested the Contaminated Cat Food and ingredients for non-conforming contaminants, including, but not limited to, Heavy Metals and/or pentobarbital;

(g)      whether Defendants wrongfully represented and continue to represent that the Contaminated Cat Food was natural, nutritious, and of a superior quality;

(h)      whether Defendants' representations in their warranties packaging and/or labeling are false, deceptive, and misleading;

(i)      whether those representations are likely to deceive a reasonable consumer;

(j)      whether a reasonable consumer would consider that the Contaminated Cat Food containing and/or having a material risk of containing the following ingredients or contaminants to be a material fact in purchasing cat food:

Heavy Metals; BPA; a material amount of non-fresh ingredients, including regrinds; a material amount of non-regional ingredients; pentobarbital; and/or any other ingredients and contaminants that did not conform to the labels, packaging, advertising, and statements;

(k)     whether Defendants had knowledge that the representations on the packaging of the Contaminated Cat Food were false, deceptive, and misleading;

(l)     whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(m)     whether Defendants' representations and descriptions on the packaging of the Contaminated Cat Food was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(n)     whether Defendants violated Illinois law;

(o)     whether Defendants engaged in unfair trade practices;

(p)     whether Defendants engaged in false advertising;

(q)     whether Defendants committed fraud in utilizing the Misleading Packaging Claims;

(r)     whether Defendants unjustly enriched themselves at consumers' expense;

(s)     whether Defendants' had a duty to disclose the material omissions concerning the quality and nature of the Contaminated Cat Food and its ingredients;

(t)     whether Plaintiff and the members of the Class are entitled to actual, statutory, and treble damages; and

(u)     whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

178.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class Members.  Identical statutory violations and business practices and harms are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

179.     Plaintiff's claims are typical of those of the Class Members because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

180.     Plaintiff will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

181.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

182.     Questions of law and fact common to the Class predominate over any questions affecting only individual members of a Class.

183.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### Fraud against Defendants on Behalf of the Class

184.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.     Defendants falsely represented to Plaintiff and the Class that their Contaminated Cat Food was:

41

    (a)     Biologically Appropriate™;

    (b)     "Fresh Regional Ingredients"; and

    (c)     "Delivering Nutrients Naturally."

186.    Defendants intentionally and knowingly made these misrepresentations to induce Plaintiff and the Class Members to purchase their Contaminated Cat Food.

187.    Defendants knew that their representations about the Contaminated Cat Food were false in that the Contaminated Cat Food contain or have a material risk of containing levels of Heavy Metals, toxins, pentobarbital, BPA, a material amount of non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.  Defendants allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

188.    Plaintiff and the Class relied on these misrepresentations and purchased the Contaminated Cat Foods to their detriment.  Given the deceptive manner in which Defendants advertised, represented, and otherwise promoted the Contaminated Cat Food, the reliance by Plaintiff and the members of the Class on Defendants' misrepresentations was justifiable.

189.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they have purchased Contaminated Cat Food that are worth less than the price they paid and that they would not have purchased at all had they known of the presence of heavy metals, toxins, pentobarbital, BPA, a material amount of non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, and statements.

190.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT II

**Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*., Against Defendants on Behalf of the Class**

191.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

192.    The conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*. (hereinafter, "ICFA").

193.    Defendants' deceptive conduct alleged herein violated the following provisions of Illinois' Consumer Protection Act:

(a)    815 Ill. 505/2(a)(4), by negligently, recklessly, and/or intentionally using deceptive representations or designations of geographic origin in connection with its Contaminated Cat Food using the following misleading packaging claims:

(1)    "Delivering Nutrients Naturally";

(2)    Biologically Appropriate™; and

(3)    "Fresh Regional Ingredients."

(b)    815 Ill. 505/2(a)(7), by negligently, recklessly, and/or intentionally representing that the Contaminated Cat Food were of a particular standard, quality, or grade, when they were of another; and

(c)    815 Ill. 505/2(a)(9), by negligently, recklessly, and/or intentionally advertising the Contaminated Cat Food with intent not to sell them as advertised.

194.    Specifically, Defendants failed to disclose that the Contaminated Cat Food contained and/or had a material risk of containing pentobarbital, regrinds, refreshed ingredients, expired ingredients, regrinds that contained pentobarbital, a material amount of non-regional

ingredients and/or other ingredients and contaminants that did not conform to Defendants' packaging claims and involved insufficient Heavy Metal testing,

195.    Defendants intended for Plaintiff and the Class Members to rely on and accept as true these advertisements and representations in deciding whether to purchase the Contaminated Cat Food, and at what price.

196.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive consumers with respect to the Contaminated Cat Foods' quality, ingredients, and suitability for consumption by cats.

197.    Defendants' misrepresentations, concealment, omissions, and other deceptive conduct were likely to cause consumers to purchase and/or overpay for the Contaminated Cat Food.

198.    Defendants' deceptive trade practices were misleading and deceiving to Illinois consumers because the Contaminated Cat Food contained and/or had a material risk of containing the following non-conforming ingredients and contaminants:

(a)     heavy metals;

(b)     a material amount of non-regional ingredients;

(c)     a material amount of non-fresh ingredients, including regrinds;

(d)     BPA;

(e)     pentobarbital; and/or

(f)     any other ingredients or contaminants that do not conform to the packaging claims.

199.    Defendants' deceptive trade practices significantly impacted the public.

200.    Defendants' misrepresentations, concealment, omissions, and other deceptive acts occurred before Plaintiff and the Class decided to purchase the Contaminated Cat Food.

201. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive Plaintiff and the Class with respect to the Contaminated Cat Food quality, ingredients, and suitability for consumption by cats.

202. Defendants' misrepresentations, concealment, omissions, and other deceptive conduct did in fact deceive and cause Plaintiff and the Class Members to purchase and/or overpay for the Contaminated Cat Food. The facts misrepresented, concealed, or not disclosed by Defendants with respect to the presence of Heavy Metals, pentobarbital, toxins, BPA, a material amount of non-regional and non-fresh ingredients, and/or unnatural or other ingredients that do not conform to the labels, packaging, advertising, warranties, and statements are material facts because Plaintiff and any reasonable consumer would have considered those facts important in deciding whether to purchase the Contaminated Cat Food, and at what price.

203. If Plaintiff and the Class Members had known that the Contaminated Cat Food did not in fact match the quality and ingredients described above, they would not have paid the price premium they paid for the Contaminated Cat Food.

204. If Plaintiff and the Class Members had known that the Contaminated Cat Food did not in fact match the quality and ingredients described above, they would not have purchased the Contaminated Cat Food at all.

205. As a result of Defendants' conduct, Plaintiff and the Class Members have suffered actual damages, and losses as described above as a result of Defendants' deceptive business trade practices.

206. As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendants set forth above, Plaintiff and the Class Members are entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs, as set forth in Section 10a of the ICFA.

207.    Defendants' deceptive, misleading, unfair, and unconscionable practices set forth above were done willfully, wantonly, and maliciously, entitling Plaintiff and the Class Members to an award of punitive damages.

**COUNT III**
**Unjust Enrichment Against Defendants Individually and**
**on Behalf of the Class**

208.    Plaintiff realleges each and every allegation contained above, as though fully set forth herein.

209.    Substantial benefits have been conferred on Defendants by Plaintiff and the Class through the purchase of the Contaminated Cat Food.  Defendants knowingly and willingly accepted and enjoyed these benefits.

210.    Defendants either knew or should have known that the payments rendered by Plaintiff were given and received with the expectation that the Contaminated Cat Food would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendants.  As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

211.    Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiff and the Class.

212.    Plaintiff and the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.  Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.     An order declaring this action to be a proper class action, appointing Plaintiff and their counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B.     An order enjoining Defendants from selling the Contaminated Cat Food until the Heavy Metals, pentobarbital, toxins, BPA, material amounts of non-regional and non-fresh ingredients, and/or unnatural or other ingredients are removed or full disclosure of the risk or and/or presence of such appear on all labels, packaging, and advertising;

C.     An order enjoining Defendants from selling the Contaminated Cat Food in any manner suggesting or implying that they are healthy, nutritious, superior quality, natural, and/or unadulterated, and made with fresh and regional ingredients that were never outsourced;

D.     An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.     An order requiring Defendants to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of Illinois law, plus pre- and post-judgment interest thereon;

G.     An order requiring Defendants to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H. An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

I. An order requiring Defendants to pay punitive damages on any count so allowable;

J. An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Class; and

K. An order providing for all other such equitable relief as may be just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 17, 2020                    LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By: /s/ Rebecca A. Peterson
ROBERT K. SHELQUIST, *Pro Hac Vice*
REBECCA A. PETERSON, *Pro Hac Vice*
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rapeterson@locklaw.com
         rkshelquist@locklaw.com

WEXLER WALLACE LLP
KENNETH WEXLER
MARK TAMBLYN
UMAR SATTAR
MICHELLE PERKOVIC
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
E-mail: kaw@wexlerwallace.com
         mjt@wexlerwallace.com
         us@wexlerwallace.com
         mp@wexlerwallace.com

WEXLER WALLACE LLP
MARK T. TAMBLYN, *Pro Hac Vice*
333 University Avenue, Suite 200
Sacramento, CA 95825
Tel: (916) 565-7692
E-mail: mjt@wexlerwallace.com


ROBBINS LLP
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsllp.com
smckany@robbinsllp.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON, *Pro Hac Vice*
KARLA M. GLUEK
RAINA C. BORRELLI, *Pro Hac Vice*
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
rborrelli@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
CHARLES J. LADUCA
KATHERINE VAN DYCK
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
charles@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH J. DEPALMA
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
       scruzhodge@litedepalma.com

ANDREWS DEVALERIO LLP
GLEN DEVALERIO
DARYL ANDREWS
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: (617) 936-2796
E-mail: glen@andrewsdevalerio.com
       daryl@andrewsdevalerio.com

POMERANTZ LLP
GUSTAVO F. BRUCKNER
SAMUEL J. ADAMS
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
E-mail: gfbruckner@pomlaw.com
       sjadams@pomlaw.com

LITE DEPALMA GREENBERG, LLC
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
E-mail: kcarroll@litedepalma.com
       kshamberg@litedepalma.com

**Attorneys for Plaintiff**

# Exhibit 1

(a)     Acana Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food



(b)     Acana Regionals Grasslands with Lamb, Trout, and Game Bird Dry Cat Food



(c)     Acana Regionals Meadowland with Poultry, Freshwater Fish, and Eggs Dry

Cat Food



(d)     Acana Regionals Pacifica with Herring, Pilchard, Flounder, Hake, and

Rockfish Dry Cat Food



(e)     Acana Regionals Wild Atlantic New England Fish and Fresh Greens Dry

Cat Food



(f)     Orijen Cat and Kitten Dry Cat Food



(g)    Orijen Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food



(h)    Orijen Six Fish New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Cat Food



(i)    Orijen Tundra Boer Goat, Wild Boar, Venison, Arctic Char, Free-Run Duck, and Mutton



(j)    Orijen Fit and Trim Fresh Free-run Chicken and Turkey, Nest-Laid Eggs, and Wild-Caught Fish



# Exhibit 2

| Product Name | arsenic ug per kg | bpa ug per kg | cadmium ug per kg | mercury ug per kg | lead ug per kg |
|---|---|---|---|---|---|
| ACANA Regionals Appalachian Ranch with Red Meats and Freshwater Catfish Dry Cat Food | 385.00 | 141.50 | 32.60 | 9.40 | 418.10 |
| ACANA Regionals Grasslands with Lamb, Trout, and Game Bird Dry Cat Food | 405.80 | 139.00 | 39.50 | 14.30 | 407.60 |
| ACANA Regionals Meadowland with Poultry, Freshwater Fish and Eggs Dry Cat Food | 959.20 | 233.80 | 39.30 | 13.40 | 310.40 |
| ACANA Regionals Pacifica with Herring, Pilchard, Flounder, Hake & Rockfish Dry Cat Food | 2504.50 | 173.60 | 79.30 | 48.80 | 34.00 |
| ACANA Regionals Wild Atlantic New England Fish and Fresh Greens Dry Cat Food | 3639.40 | 134.60 | 105.30 | 45.50 | 245.40 |
| ORIJEN Cat and Kitten Dry Cat Food | 821.20 | 140.60 | 103.10 | 13.30 | 194.10 |
| ORIJEN Regional Red Angus Beef, Wild Boar, Goat, Lamb, Pork, Mackerel Dry Cat Food | 1086.10 | 224.00 | 68.10 | 20.80 | 342.50 |
| ORIJEN Six Fish New England Mackerel, Herring, Flounder, Redfish, Monkfish, Silver Hake Dry Cat Food | 3187.50 | 135.20 | 154.80 | 54.10 | 42.00 |